UNITED STATES of America, Appellee,

v.

**MacDONALD & WATSON WASTE OIL COMPANY, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**NARRAGANSETT IMPROVEMENT COMPANY, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Eugene K. D'ALLESANDRO, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Faust RITAROSSI, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Frances SLADE, Defendant, Appellant.**

**Nos. 90–1051 to 90–1054 and 90–1212.**

United States Court of Appeals, First Circuit.

Heard Oct. 2, 1990.

Decided May 10, 1991.

---

**3.** Judge Torruella is of the view that this court should not review evidence on appeal which was not first presented to the trial court. *See United States v. Bayko,* 774 F.2d 516, 520 (1st Cir.1985) ("Normally, all issues and facts to be considered on appeal should first have been put to the lower court."). In this particular case, however, the court's decision to view the video tape does not materially affect Judge Torruella's ultimate determination regarding summary judgment. Thus Judge Torruella does not deem it necessary to substantively disagree with the decision of this court.

Evan Slavitt with whom Fine & Ambrogne, Boston, Mass., David H. Sholes and Sholes & Sholes were on brief, Warwick, R.I., for defendant, appellant MacDonald & Watson Waste Oil Co.

Stephen R. Delinsky with whom Fine & Ambrogne was on brief, Boston, Mass., for defendant, appellant Eugene K. D'Allesandro.

Jack Zalkind, Boston, Mass., for defendant, appellant Frances Slade.

William A. Dimitri, Jr., Providence, R.I., for defendant, appellant Faust Ritarossi.

John Tramonti, Jr., with whom Karen R. Ellsworth was on brief, Providence, R.I., for defendant, appellant Narragansett Impr. Co.

Joseph G. Block, Dept. of Justice, Environment and Natural Resources Div., Environmental Crimes Section, with whom Richard B. Stewart, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Craig Moore, Asst. U.S. Atty., Providence, R.I., H. Claire Whitney, James A. Morgulec, J. Carol Williams and Edward J. Shawaker, Dept. of Justice, Environment and Natural Resources Div., were on brief, Washington, D.C., for the U.S.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal concerns the criminal liability of individuals and corporations under hazardous waste disposal laws.

Following a jury trial in the district court, appellants were convicted, *inter alia*, of having violated criminal provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* (1982 & Supp. V 1987) and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603(b) (1982 & Supp. V 1987).

The indictment originally contained 53 counts. By September 11, 1989, when the trial began, 16 counts had been dismissed and eight severed; and, during trial 12 more counts were dismissed on the government's motion, leaving 17 for submission to the jury. The submitted counts all related to the transportation and disposal of toluene waste from the Master Chemical Company. Appellants were convicted on all 17 counts, as follows:

MacDonald & Watson Waste Oil Co. ("MacDonald & Watson"), Faust Ritarossi, Frances Slade and Eugene K. D'Allesandro were convicted, on two counts each, of knowingly transporting and causing the transportation of hazardous waste, namely toluene and soil contaminated with toluene, to a facility which did not have a permit, in violation of RCRA, § 3008(d)(1), 42 U.S.C. § 6928(d)(1).

MacDonald & Watson and Narragansett Improvement Co. ("NIC") were convicted of knowingly treating, storing and disposing of hazardous waste, namely toluene and soil contaminated with toluene, without a permit, in violation of RCRA, § 3008(d)(2)(A), 42 U.S.C. § 6928(d)(2)(A).

MacDonald & Watson and NIC were convicted of failing to report the release of a hazardous substance into the environment in violation of CERCLA, § 103(b)(3), 42 U.S.C. § 9603(b)(3).

MacDonald & Watson was convicted of making false statements in violation of 18 U.S.C. § 1001 and of mail fraud in violation of 18 U.S.C. § 1341.

## I. FACTS

Located in Boston, Massachusetts, Master Chemical Company manufactured chemicals primarily for use in the shoe industry. Master Chemical had been owned by the Estate of Moses Weinman (hereinafter "the Estate"), which was the principal in transactions with appellants. Among the chemicals Master Chemical used was toluene, which it stored in a two thousand gallon underground storage tank. When Master Chemical personnel discovered in the late fall or early winter of 1982 that water was entering the tank and contaminating the toluene, the tank was emptied and its use discontinued. In 1984, Master Chemical Company was sold, and the toluene tank was excavated and removed. A Master Chemical employee testified that he found a small hole in the tank, and that the soil surrounding the tank appeared black and wet and smelled of toluene.

An environmental consulting firm, Goldberg–Zoino & Associates, Inc. ("GZA"), was retained to assist in the cleanup. GZA prepared a study of the site and solicited a bid from MacDonald & Watson for the excavation, transportation, and disposal of the toluene-contaminated soil. MacDonald & Watson, a company with offices in Johnstown, Rhode Island, was in the business of transporting and disposing of waste oils and contaminated soil. MacDonald & Watson operated a disposal facility on land in Providence, Rhode Island, known as the "Poe Street Lot," leased from appellant NIC.[1] MacDonald & Watson operated the Poe Street Lot under NIC's Rhode Island RCRA permit, which authorized the disposal at the lot of *liquid* hazardous wastes and soils contaminated with non-hazardous wastes such as petroleum products. Neither NIC nor MacDonald & Watson held a RCRA permit authorizing them to dispose of *solid* hazardous wastes such as toluene-contaminated soil at the lot. At the Rhode Island administrative hearing held when NIC sought its permit, appellant D'Allesandro, president of MacDonald &

---

**1.** NIC operates an asphalt production plant on property of which the Poe Street Lot is a part.

Watson, testified that hazardous waste operations at the Poe Street Lot would be managed by MacDonald & Watson and that he would be the manager of the facility there. According to the terms of NIC's lease of the Poe Street Lot to MacDonald & Watson, NIC retained responsibility for compliance with state and federal law with respect to permitting and operating the hazardous waste treatment and storage facilities.

The Estate accepted MacDonald & Watson's bid to remove and clean up the contaminated soil. The Estate's attorney, Deborah Shadd, discussed the proposed arrangement with appellant Slade, MacDonald & Watson's employee, and sent Slade a contract under which MacDonald & Watson would remove "contaminated soil and toluene." Shadd asked Slade to review the contract. Shadd also asked Slade to have it signed for MacDonald & Watson, which she did. Thereafter, appellant Ritarossi, another employee of MacDonald & Watson, supervised the transportation of the toluene-contaminated soil from Master Chemical to the Poe Street Lot in nine 25–yard dump truck loads and one 20–yard load. A Massachusetts hazardous waste manifest accompanied each truckload, bearing the Massachusetts hazardous waste code M–001.[2] Four of the manifests bore Ritarossi's signature. Prior to acceptance of the waste at the Poe Street Lot, MacDonald & Watson employees received an "Authorization to Accept Shipment of Spill Cleanup Material" form bearing Slade's typed name, describing the spilled material as "toluene," and describing the "petroleum product and the material spilled into" as "toluene and gravel." At this point, a MacDonald & Watson employee stamped

the manifests "Non-hazardous in Rhode Island, Accepted for Processing at Asphalt Production Plant." Neither NIC nor MacDonald & Watson reported the disposal of the Master Chemical wastes as a release of a hazardous substance into the environment pursuant to CERCLA § 103(b)(3).

A. *Sufficiency of the Evidence*

■ Appellants argue that the evidence was insufficient to support their convictions. In *United States v. Gomez Pabon*, 911 F.2d 847, 852 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991), we stated the applicable standard of review:

[W]e must view the evidence "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.1990) [*cert. denied*, [— U.S. —] 111 S.Ct. 130 [112 L.Ed.2d 98] (1990) ]. The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., United States v. Aponte–Suarez*, 905 F.2d 483, 489 (1st Cir.1990) [*cert. denied*, [— U.S. —] 111 S.Ct. 531 [112 L.Ed.2d 541] (1990) and [— U.S. —] 111 S.Ct. 975 [112 L.Ed.2d 1061] (1991) ]; *United States v. Bernal*, 884 F.2d 1518, 1523 (1st Cir. 1989).

With respect to the convictions under RCRA, appellants contend that the evidence was insufficient to establish that the Master Chemical contaminated soil was a "hazardous waste" for purposes of RCRA.[3] They argue that petroleum constituents

**2.** "M–001" is a Massachusetts code designating waste oil, which is considered hazardous under Massachusetts law but not under RCRA or Rhode Island law. Mass.Regs.Code tit. 310, § 30.131 (1986) (Hazardous Waste from Non-Specific Sources). No RCRA hazardous waste identification number was assigned to the waste.

**3.** Under the relevant regulation, 40 C.F.R. § 261.33(d), the following are hazardous wastes when they are discarded or intended to be discarded:

Any ... contaminated soil ... resulting from the cleanup of a spill into or on any land or water of any commercial chemical product ... having the generic name listed in paragraph ... (f) of this section.

Commercial toluene is one such listed chemical product. Rhode Island's regulations, by incorporation of 40 C.F.R. § 261.33(d) and (f), similarly list commercial chemical product toluene and soil contaminated therewith as hazardous wastes.

other than toluene were detected in the soil, (including benzene and methyl tert-butyl ether), and that another tank containing non-hazardous petroleum derivatives toluene and benzene was located near the site of the toluene tank. They also argue that testimony regarding water entering the toluene tank and the hole discovered when the tank was removed did not establish that the toluene tank leaked, because the water could have entered through a pipe and the hole could have resulted during tank removal. These arguments are not persuasive. Contamination with other non-hazardous chemicals would not render soil that was also contaminated with toluene a non-hazardous waste. Groundwater in the toluene tank excavation pit showed toluene at 360,000 parts per million, vastly greater than levels of any other chemical. This sample data, along with testimony regarding the soil's toluene smell, and other testimony, was plainly sufficient to enable the jury to find that the soil was contaminated with toluene and was a hazardous waste as defined in the relevant regulations implementing RCRA. *See* 42 U.S.C. §§ 6921, 6903(5) and (27).

■ Appellant Frances Slade challenges the sufficiency of the evidence to convict her under § 3008(d)(1) of RCRA, which penalizes, "Any person who ... (1) *knowingly* transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter...." (Emphasis supplied). She contends that the evidence was insufficient to prove that her actions on behalf of Mac-Donald & Watson were taken with knowledge that the material involved was a RCRA hazardous waste. She complains that the prosecution relied "exclusively" on the testimony of the Estate's lawyer, Deborah Shadd, who dealt with Slade and sent her the contract covering transportation and disposal of the Master Chemical waste. This evidence, Slade contends, does not establish that Slade actually reviewed the contract and specifications, or would have learned from these the specific nature of the contaminated soil. Further, she argues that neither the contract nor the attached specifications identified the contaminating substance as commercially pure toluene.

We disagree that the evidence was insufficient for the jury to infer Slade's knowledge concerning soil contaminated with commercial chemical product toluene, the hazardous waste charged. There was testimony from a former MacDonald & Watson employee that Slade was "in charge of material coming in and coming out of MacDonald & Watson to Narragansett Improvement." There was evidence that Slade had attended state compliance inspections. The jury could infer that she was knowledgeable as to what substances were allowed, and what were disallowed under NIC's permit. It could also infer from her responsibilities and her dealings with Deborah Shadd that she reviewed the contract and specifications Shadd sent to her, and learned therefrom the nature of the substance. Attorney Shadd's May 29, 1986, letter of transmission to Slade requested her to "review the enclosed agreement, particularly the first four pages," and then arrange for it to be signed before a Notary Public by an authorized representative of MacDonald & Watson. Shadd's letter to Slade also requested her to send copies of MacDonald & Watson's licenses to transport and dispose of hazardous waste, further indicating that hazardous waste was involved and that the question of legality and a proper permit was critical. The first page of the enclosed agreement recited that the contractor "agrees to remove and dispose of contaminated soil and toluene," and would do so "in accordance with all applicable federal, state, and local laws, regulations, and requirements." The specifications attached stated that soil "contaminated with toluene and lesser amounts of other volatile organic compounds has been identified ... at the site of a formerly existing 2,000 gallon underground storage tank used *for the storage of toluene.*" (Emphasis supplied.) Clearly, Slade was on notice that more than a mere petroleum by-product was involved. The specifications also conditioned disposal of the contaminated soil at MacDonald & Watson's facility upon soil characteristics meeting

"criteria for disposal at this facility." The jury could reasonably infer that Slade received Shadd's letter and the enclosed contract, and followed Shadd's directions, including her directions to review it, especially since the contract was thereafter executed by the firm's controller, Naples, who returned it to Shadd. We find the evidence sufficient, therefore, for the jury to have inferred that Slade knew the material was the hazardous waste in question.[4]

■ Ritarossi contends that the evidence was insufficient to prove that he either knew that the material shipped to NIC was subject to RCRA regulation as toluene-contaminated soil or to prove he knew the substance and limitations of NIC's permit. However, Ritarossi could be found to have signed several of the "Authorization to Accept Shipment" forms which describes the "spilled material" as toluene and provides "toluene and gravel" as the "Description of petroleum product spilled and material spilled into." Joseph Weinman (son of Moses Weinman) testified that he discussed the circumstances surrounding the leaking toluene tank with Ritarossi during excavation of the tank. Moreover, a GZA environmental consultant testified that he asked Ritarossi to include options in MacDonald & Watson's bid both for disposal at MacDonald & Watson's facility and for disposal at an out-of-state RCRA secure landfill because the consultant did not know whether MacDonald & Watson had the proper permits to dispose of the material at their facility. We find sufficient evidence from which the jury could determine that Ritarossi knew the material was toluene-contaminated soil and also to infer that he either knew that NIC's permit did not permit acceptance of such material or, at very least, willfully failed to determine the material's status under NIC's permit. *Infra.*

D'Allesandro and NIC contend that the evidence was insufficient to support their convictions. D'Allesandro was the manager and principal of MacDonald & Watson. There was evidence that he participated actively in the firm's day-to-day management, and that he had been warned on other occasions that his company had disposed of toluene-contaminated soil and that this was illegal. There was no direct evidence, however, of his knowledge of the particular shipments at issue. Since we vacate his conviction because of fundamental defects in the court's jury instructions, *see infra*, we do not reach the question of evidentiary sufficiency in his case.

■ NIC contends that the evidence was insufficient to support its conviction for the crimes of its purported agents. "A corporation may be convicted for the criminal acts of its agents, under a theory of respondeat superior ... where the agent is acting within the scope of employment." *United States v. Cincotta*, 689 F.2d 238, 241–42 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *United States v. Gold*, 743 F.2d 800, 822–23 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).[5]

---

4. Slade also contends that the evidence was insufficient to prove that she *caused* the transportation of the material under 42 U.S.C. § 6928(d)(1). Based on her position of responsibility with MacDonald & Watson (in particular her being, as testified, in charge of material coming into the NIC facility), and the fact that the contract she reviewed and handled with Master Chemical called for MacDonald & Watson to remove and dispose of contaminated soil and toluene from the original site to the MacDonald & Watson facility, the jury could reasonably conclude that Slade's role in negotiating, reviewing and facilitating the contract on behalf of MacDonald & Watson directly assisted in causing the transportation of the material. Additionally, Slade's typed name appeared on documents in connection with the shipment and delivery.

5. The district court's instructions on corporate liability were as follows:

Two of the Defendants as you know, are corporations. A corporation is a separate entity and it may be guilty of a criminal offense. A corporation, of course, cannot act for itself. It functions through officers, employees and agents. Accordingly, a corporation is chargeable with knowledge of any facts known to its officers, employees and agents and it's responsible for the actions or inactions of those officers, employees and agents at least to the extent that such knowledge, actions or inactions relate to the conduct of the corporation's business. A person need not be an employee of a corporation to be its agent. Anyone authorized to act for the corporation is its agent with respect to matters of the type for which such authority is given. Consequently,

NIC denies that either D'Allesandro or two other MacDonald & Watson clerical employees, Giagio Cefala and Brenda Santaniello, were NIC's agents for purposes of imposing criminal liability. We do not reach this question, however, since even assuming all or some of these three Mac-Donald & Watson employees were agents of NIC, NIC's convictions cannot stand given our determination that D'Allesandro, one of the three, was improperly convicted. We are unable to tell what part the finding of D'Allesandro's guilt played in the jury's determination of NIC's guilt. It is at least conceivable that, without finding D'Allesandro guilty, the jury would have acquitted NIC. Further, while the government proffered evidence that Santaniello signed the name of NIC's president to the waste manifests for the Master Chemical project and received the Authorization to Accept Shipment, the government's evidence of Santaniello's involvement in all elements of the crimes charged to NIC under RCRA, 42 U.S.C. § 6928(d)(2)(A) and CERCLA, 42 U.S.C. § 9603(b)(3) was slight. Indeed, the government did not contend that Santaniello, a clerical employee, was "in charge" of the facility within the meaning of the CERCLA provision. *See United States v. Carr*, 880 F.2d 1550, 1554 (2d Cir.1989)

(term "person in charge" does not extend to every person who might have knowledge of release, but only to supervisory personnel who occupy positions of responsibility and power); *United States v. Greer*, 850 F.2d 1447, 1453 (11th Cir.1988). In any case, given our uncertainty as to D'Allesandro's role in NIC's convictions, they must be vacated.

## B. *Federal Criminal Jurisdiction*

Appellants contend that the district court lacked jurisdiction over Counts One and Two, which charged violations of criminal provisions within RCRA, § 3008(d), 42 U.S.C. § 6928(d)(1) and (2).[6] Appellants rely on the RCRA provision which allows the United States Environmental Protection Agency ("EPA") Administrator to authorize a state to administer and enforce a hazardous waste program under RCRA Subtitle C, § 3006, 42 U.S.C. § 6926.[7] They argue that Rhode Island's authorized state program[8] displaced the federal program, leaving no federal crime and ousting the federal court of jurisdiction. Appellants emphasize the statutory language which authorizes the state to carry out its program *in lieu of* the federal program, and to issue and *enforce* permits. Appel-

---

a corporation is liable for the acts of its agents as long as those acts are within the scope of the authority given to that agent.

**6.** Section 3008(d) of RCRA, 42 U.S.C. § 6928(d), provides that:

Any person who—
(1) knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052)
(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter—
 (A) without a permit under this subchapter or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052); or
 (B) in knowing violation of any material condition or requirement of such permit);

. . . . .

shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed two years (five years in the case of a violation of paragraph (1)

or (2)), or both [with penalty to be doubled after a first conviction].

**7.** 42 U.S.C. § 6926(b) provides, in pertinent part:

Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and, after notice and opportunity for public hearing, submit to the Administrator an application, in such form as he shall require, for authorization of such program.... Such State is authorized to carry out such program in lieu of the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste ... unless, ... (1) such State program is not equivalent to the Federal program ..., (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter.

**8.** Rhode Island's hazardous waste program has received final EPA approval, 51 Fed.Reg. 3780 (Jan. 30, 1986).

lants argue that, after state program approval, permits issued by the state are to be criminally as well as civilly *enforced* by the state alone, under EPA-scrutinized state law. They note that pursuant to 42 U.S.C. § 6926(e), whenever the state fails to administer and enforce a state program in accordance with federal standards, the state authorization may be withdrawn and a federal program reinstated.

The linchpin of appellants' argument is that the term "program" in § 6926 incorporates the exclusive responsibility to enforce criminal provisions penalizing the disposal of hazardous wastes. *See Wyckoff Co. v. Environmental Protection Agency,* 796 F.2d 1197, 1199–1200 (9th Cir.1986) (rejecting argument that Congress intended to revoke EPA's power to issue orders under 42 U.S.C. § 3013 when state program is in effect). Appellants urge that criminal enforcement logically falls within the meaning of "program" just as do the regulatory and permitting provisions which are, with certain explicit reservations, generally part of the federal program that is displaced (not merely supplemented) by authorized state programs. *See* 40 C.F.R. § 264.1(f) (1990) (exempting persons who treat, store or dispose of a hazardous waste in a state with an approved RCRA hazardous waste program from the scope of Part 264 federal regulations); 42 U.S.C. §§ 6925, 6927 (providing alternatively for EPA issuance of permits and inspections where state programs have not been authorized, or state issuance of permits and inspections where state programs have been authorized).

■ We find no merit in the above contention. The language of the challenged federal criminal provision, 42 U.S.C. § 6928(d), does not limit prosecutions thereunder to those who deal with facilities lacking a *federal* permit. The statute criminalizes "Any person" who acts without, or in respect to facilities lacking, "a permit under this subchapter." A permit under this subchapter is one issued by the Administrator of the EPA or by an authorized state. 42 U.S.C. § 6925.

That § 6928(d), and companion federal criminal provisions, are meant to apply within states having authorized programs is amply supported by the legislative history. Prior to the 1984 RCRA Amendments —when, as today, RCRA provided for state programs which, when federally approved, would be carried out "in lieu" of the federal program, and which authorized the state to issue and enforce permits—the federal penal statute preceding § 6928(d) was worded so as to apply in so many words to violations both of federal and state permitting programs. Thus, the earlier version provided:

> Any person who knowingly—
>
> (1) transports any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under section 3005 of this title (or section 3006 of this title in case of a State program), . . .
>
> shall, upon conviction, be subject to a fine of not more than $25,000 for each day of violation, or to imprisonment not to exceed one year, or both.

Resource Conservation and Recovery Act of 1976, Pub.L. No. 94–580, § 3008(d)(1), 90 Stat. 2795, 2812; 42 U.S.C. § 6928(d)(1). The 1984 amendments increased the applicable criminal penalties and simply substituted "under this subchapter" for the references to the specific subsections under which permits, federal and state, may be granted.[9] The new language, "without a

---

9. Changes made in 1984 to the other criminal provisions of the current RCRA, § 3008(d), 42 U.S.C. § 6928(d), are also relevant. Subsections (d)(3) and (d)(4) relate to fraud and concealment activities under federal and state RCRA regulations. The legislative history states, "the amendments also clarify the fact that paragraph (d)(4) applies *to records or other documents* required by state regulation in a State with an authorized RCRA program." H.R.Rep. No. 98–198, 98th Cong., 2d Sess., May 17, 1983 at 55, *reprinted in* 1984 U.S.Code Cong. & Admin.

News 5576, 5614. Prior to the 1984 amendments, subsection (d)(4)'s terms applied to "regulations promulgated by the Administrator under this subchapter." The 1984 amendments changed this language to: "regulations promulgated by the Administrator (or by a State in the case of an authorized State program) under this subtitle." The same change was made in the criminal provision relating to omission of information in subsection (d)(3) and the same language is used in the new subsection (d)(5),

permit under this subchapter," subsumed both state and federal permits, as both types are provided for within "this subchapter." The latter did not, therefore, in any way narrow the scope of federal criminal jurisdiction. Nor did the legislative record hint at any intention by Congress to narrow the scope of federal criminal jurisdiction. To the contrary, Congress manifested its desire to retain a strong federal presence. H.R.Conf.Rep. No. 98–1133, 98th Cong., 2d Sess., October 3, 1984 at 110, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5681; S.Rep. No. 98–284, 98th Cong., 1st Sess., October 28, 1983 at 45 ("The Federal government's ability to obtain criminal penalties against generators and other persons who knowingly cause the transportation of hazardous waste to an unpermitted facility is essential to the regulatory scheme.") Had Congress intended to impose a hitherto unknown limitation upon the scope of its laws criminalizing permit violations, its intentions would surely have been manifested; for example, § 6928(d) would have been reworded to indicate that it applied only to persons in states lacking an authorized state program.

Appellants' reliance upon Congressional reports discussing state takeover and enforcement of the RCRA hazardous waste program is misplaced. These reports, like the statute itself, simply do not focus upon whether "program" was intended to carry with it the *exclusive* right to engage in criminal enforcement. *See, e.g.,* H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 24, pt. 1, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6238, 6262 ("It is the Committee's intention that the States are to have primary enforcement authority and if at anytime (sic) a State wishes to take over the hazardous waste *program* it is permitted to do so, provided that the State laws meet the Federal minimum requirements

for both administering and enforcing the law.") (Emphasis supplied).

Appellants contend there is significance in the absence from the federal criminal statute of the notice requirement found in RCRA civil enforcement § 3008(a). Section 3008(a) authorizes the Administrator of EPA to bring a civil action in United States district court for RCRA violations, and specifically provides,

> [i]n the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 3006 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

RCRA § 3008(a)(2). In § 3008(d), there is no specific reference to alternative enforcement by state or federal authorities or to notice in the case of federal enforcement in RCRA-authorized states. Appellants argue that federal criminal enforcement would warrant notice to the authorized state to a greater extent than civil enforcement, and that the absence of such a notice provision for criminal cases indicates that Congress intended no federal criminal enforcement in authorized states. It is apparent from the legislative history, however, that § 6928(a) is directed at obtaining rapid compliance, and notice prior to federal intervention is therefore significant for reasons not applicable to criminal enforcement, which is directed toward after-the-fact penalties. *See* S.Rep. No. 96–172, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S. Code Cong. & Admin.News 5019, 5022 ("1980 Senate Report") ("This section also amends section 3008 to authorize the Administrator to act against violations before a 30–day period has elapsed. This provision is aimed at stopping so-called 'mid-

---

which prohibits knowing transportation of RCRA hazardous wastes without a manifest where state or federal regulations require such a manifest.

Consistent with § 6928(d)(1), the criminal prohibitions of subsection (d)(2) and the new subsection (d)(7) relating to *permit* crimes simply state violations in terms of a "permit under

this subchapter." Congress simply *clarified* that subsection (d)(4) always has applied in the case of state-authorized programs by adding the precise textual basis on which to conclude that Congress intended to remove federal criminal jurisdiction by simplifying the statutory language with respect to permit crimes in subsections (d)(1) and (d)(7).

night dumping' which may not continue at any location for more than 30 days, and to seek penalties for single occurrences, rather than just continuing offenses."). The statutory differences, therefore, can be explained on grounds having nothing to do with a purported cancellation of federal criminal jurisdiction.

## C. *RCRA Violations*

■ MacDonald & Watson, D'Allesandro, Slade and Ritarossi were convicted of knowingly transporting, or causing the transportation of hazardous waste, i.e., toluene-contaminated soil, to a facility which does not have a permit, under 42 U.S.C. § 6928(d)(1). *See* note 6, *supra.* MacDonald & Watson and NIC were convicted of knowingly treating, storing and disposing of a hazardous waste without a permit, under § 6928(d)(2)(A). *See* note 6, *supra.* They now argue that their convictions were illegal because NIC did in fact have a Rhode Island RCRA permit, albeit one that did not allow disposal into its facility of toluene-contaminated soil. NIC's permit, instead, authorized acceptance of liquid RCRA hazardous wastes and non-hazardous solids, such as petroleum-contaminated solid materials. While NIC's permit, therefore, provided no authority to dispose of the hazardous waste in question, appellants contend they did not violate either prong of § 6928(d) because the statute only penalizes transportation "to a facility which does not have a permit under this subchapter," and disposal "without a permit under this subchapter."

We find this argument entirely unpersuasive. Subsections (d)(1) and (d)(2)(A) both penalize unpermitted transportation and disposal of *"any* hazardous waste identified or listed under this subchapter" (emphasis supplied), thus embracing the hundreds of different noxious substances described and listed in EPA regulations. *See* 40 C.F.R. Subparts C and D (1990). As these toxic wastes vary enormously in levels of toxicity and other characteristics, they require different kinds of facilities for safe disposal. In order to channel each

waste to a proper disposal facility, Congress established a system of permits, with each permit indicating what wastes that particular facility may legally accept. Thus the statutory phrase "which does not have a permit" naturally conveys the meaning: "which does not have a permit for that substance." Having a permit for some different substance would frequently offer no more protection to the public than having no permit at all. Just as a deer hunting license does not imply a license to hunt duck, a facility "which does not have a permit" clearly implies, in this context, a facility which does not have a relevant permit. Any other construction would ignore the central object of the permit program, which is to limit the disposal of any given waste to an appropriate facility. It is well accepted that,

> criminal penalties attached to regulatory statutes intended to protect public health, in contrast to statutes based on common law crimes, are to be construed to effectuate the regulatory purpose. (Citing cases.)

*United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 666 (4th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). RCRA is a public welfare statute "enacted to protect the national health and environment," *Wycoff Co. v. E.P.A.,* 796 F.2d 1197, 1198 (9th Cir.1986), and to provide "nationwide protection against the dangers of improper hazardous waste disposal." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 11, *reprinted in* 1976 U.S. Code Cong. & Admin.News 6238, 6249 (hereinafter, "1976 House Report"). *See also United States v. Hoflin,* 880 F.2d 1033, 1038 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990) ("The overriding concern of RCRA is the grave danger to people and the environment from hazardous wastes.")

To construe subsection (d)(1) and subsection (d)(2)(A) as appellants urge would not only involve reading the word "permit" abnormally (i.e., as meaning an irrelevant permit as well as a relevant one),[10] but would

---

10. Appellants argue that "[t]he natural, straight-

forward" interpretation of "does not have a per-

significantly weaken the protection against the danger that most concerned Congress, namely the improper disposal of toxic wastes. *See generally United States v. Park*, 421 U.S. 658, 672–73, 95 S.Ct. 1903, 1911–12, 44 L.Ed.2d 489 (1975); *United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 136–37, 88 L.Ed. 48 (1943).

■ Appellants contend that their strained construction of the word "permit" is needed to protect innocent transporters and facility operators. Especially under § 6928(d)(1) which pertains to transporters, they suggest that Congress did not intend to impose criminal penalties on persons who lack responsibility to identify the wastes or designate the facility that will receive them. For this reason, they contend, it is necessary to limit criminal liability to just those transporters who violate "a responsibility that is unambiguously theirs: They may not deliver hazardous wastes to facilities that are outside the RCRA permitting, inspection and reporting system." In other words, so long as a permit of some type exists, the transporter's duty has been correctly fulfilled. Appellants expand this theory into the notion that Congress wanted a "calibrated" system of punishments, limiting the heavy criminal penalties of § 6928(d)(1) to transporters who, like "midnight dumpers," transport hazardous waste to unpermitted disposal sites, and leaving all other violations to the civil enforcement machinery.

While appellants weave an ingenious argument, we find little in the legislative history to suggest that Congress had this restrictive reading of § 6928(d)(1) in mind. To the contrary, when Congress added "or causes to be transported" to subsection (d)(1), the House Report indicated plainly that generators, at least, would be liable under that statute for the improper transportation *and disposal* of waste:

> This provision clarifies the criminal liability of generators of hazardous waste who knowingly cause the waste to be transported to an unpermitted facility.

Because the generator is in the best position to know the nature of his waste material, the regulatory scheme established by RCRA places *a duty on the generator in the first instance to make arrangements to transport and dispose of his waste properly*. EPA's ability to obtain criminal penalties against generators who knowingly cause the transportation of hazardous waste to an unpermitted facility is essential to the regulatory scheme.

H.R.Rep. No. 198, 98th Cong., 2d Sess. 54, pt. 1, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5613 (emphasis added) (hereinafter "1984 House Report"). The underscored language is inconsistent with the argument that subsection (d)(1) requires no more than an irrelevant permit, since such a permit would not ensure the making of arrangements to transport and dispose of waste *properly*. As subsection (d)(1) itself makes no distinction between defendants who are generators, as such, and those who are transporters, it follows that subsection (d)(1) contemplates arrangements in all cases for *proper* waste disposition, i.e., a proper permit, not merely *some* type of permit.

Appellants' argument indirectly raises an interesting issue not actually before us: namely, whether "knowingly" in subsection (d)(1) not only requires knowledge as to the nature of the hazardous waste being transported, but also knowledge of the facility's permit status, i.e., that the facility lacked a proper permit. The district court here instructed the jury that, to convict under subsection (d)(1), it had to find that defendants *knew* that NIC lacked a proper permit authorizing it to treat, store or dispose of this type of hazardous waste, or else must find that defendants willfully failed to determine whether NIC did or did not have such a permit. This instruction, both on the need for knowledge and on "willful failure" to determine permit status, is consistent with the Eleventh Circuit's holding in *United States v. Hayes International*

mit" can only mean "is entirely without a permit." We think the "natural straightforward interpretation" in this context is rather, "is with-

out a permit for the hazardous waste in question."

*Corporation,* 786 F.2d 1499, 1503–05 (11th Cir.1986). Obviously, if a conviction under subsection (d)(1) requires that a defendant know, or be willfully indifferent to, the facility's lack of a proper permit, this would eliminate the danger of convicting some hypothetical transporter who lacked information that the disposal facility was without the proper license. Thus, under the given instruction, most of the concerns appellants now raise are beside the point. The correctness of this part of the court's instruction is not, however, before us, and we need not, and do not, decide now whether, as charged, the knowledge requirement under subsection (d)(1) extended to the facility's permit status. As an initial matter, however, we find much to be said for the district court's position.

■ In arguing that "without a permit" means "entirely without a permit," appellants do not limit themselves to subsection (d)(1). In respect to the subsection (d)(2) conviction against MacDonald & Watson and NIC, appellants also urge that the words "knowingly treats, stores, or disposes of any hazardous waste ... without a permit" are confined to facilities lacking in any sort of RCRA hazardous waste permit. They make this argument even though persons who treat, store, or dispose of hazardous wastes will obviously be better positioned than at least some transporters to know what materials a particular permit covers.[11]

Appellants make much of the fact that subsections (d)(2)(A) and (B) explicitly distinguish between treatment, storage and disposal "without" a permit and treatment, storage and disposal "in knowing violation of any material condition or requirement" of a permit. *See* note 6, *supra.* Appellants argue that interpreting subsection

(d)(2)(A) to penalize handling any hazardous waste not authorized in a facility's existing permit would emasculate subsection (d)(2)(B), rendering it superfluous. Appellants contend that RCRA originally criminalized only hazardous waste transportation to a facility without a permit and disposal without a permit. Pub.L. No. 94–580, 90 Stat. 2795, 2812. In 1978, Congress amended subsection (d)(2) to include treatment and storage. In 1980, Congress added subsection (d)(2)(B) concerning permit violations to "eliminate ambiguity [regarding "whether a violation of a permit condition constitutes a criminal violation"] by providing explicit penalties for knowingly failing to comply with a material condition of the permit." 1980 Senate Report at 36–37, 1980 U.S.Code Cong. & Admin.News 5036. Appellants find significance in the fact that Congress declined to make a similar change in 1980 to subsection (d)(1) to criminalize transportation to a disposal facility where receipt of the hazardous waste in question is "in violation" of a permit "condition or requirement," leaving subsections (d)(1) and (d)(2)(A) limited to cases where the facility had no permit at all.

We find little force in arguments such as the above.

*First,* there is nothing to the contention that construing subsection (d)(2)(A) as penalizing disposal without a relevant permit renders subsection (d)(2)(B) surplus. The latter penalizes treatment, storage and disposal "in knowing violation of any material condition or requirement" of a permit. The words "permit condition" and "permit requirement" as used in the EPA's regulations describe a vast array of collateral obligations imposed when wastes are stored at permitted facilities, such as the duty to operate and maintain properly all

---

11. The court did not instruct, as an element of the charged subsection (d)(2)(A) violation, that MacDonald & Watson and NIC (the only persons so charged) had to have known that the NIC permit did not cover the substance stored at the Poe Street Lot. Neither defendant, however, objected to the absence of such an instruction, and they do not now raise the issue on appeal. Given that NIC was the permit holder, and MacDonald & Watson the acknowledged manager of the disposal site, as well as the

contractor for disposal of the toluene-contaminated soil, the omission of such an instruction, even if required, could hardly have been harmful to these defendants. *Compare United States v. Johnson & Towers,* 741 F.2d at 667–69 (knowledge of permit status is an element of a subsection (d)(2)(A) offense) with, *contra, United States v. Hoflin,* 880 F.2d at 1036–39. As the question is not before us, we need not resolve it here.

required treatment and control systems, to maintain proper records, to monitor and sample site conditions, and so on. *See, e.g.,* 40 C.F.R. § 280.30 and § 270.31. Depending on the kind of waste authorized to be stored under the permit, conditions are imposed that form part of the permit: for example, that waste be stored on a concrete pad surrounded by a containment berm, or that mutually reactive wastes not be stored in the same room. The effect of subsection (d)(2)(B) is simply to criminalize the knowing violation of any such "material condition or requirement" of a permit. Clearly, subsection (d)(2)(A)—penalizing disposal "without a permit"—does not adequately cover such breaches of a permit's requirements and conditions. By the same token, construing subsection (d)(2)(A) to penalize the disposal of a given hazardous waste without a permit for storage of that particular waste in no way renders subsection (d)(2)(B) surplus.

*Second,* we are puzzled by appellants' suggestion that the conduct charged here under subsection (d)(2)(A) should really have been charged as the violation of a material condition or requirement of a permit under subsection (d)(2)(B). For such a violation to have occurred, it would have to be shown that NIC's existing permit contained a condition or requirement forbidding disposal of the substance in question or, at least, of any substance not affirmatively authorized in that permit. Perhaps NIC's permit contained such an express or implicit condition, but, if it did, appellants have not identified it. If not, the subsection (d)(2)(A) charge was the only possible one for this kind of conduct. But whether or not a charge under subsection (d)(2)(B) was also possible, we believe subsection (d)(1) and subsection (d)(2)(A) violations were properly alleged.

*Third,* the absence of a "permit violation" subsection in subsection (d)(1) is in no way inconsistent with our reading of subsection (d)(1) and subsection (d)(2)(A). Facility operators are in a position to control the manner of hazardous waste disposal and are therefore appropriately made liable for knowing infractions of material conditions and requirements of the permit issued to them. Since generators and transporters have little control over either the operation of the facility or the manner of disposal after the wastes are delivered to the facility, it is not surprising that subsection (d)(1) omits a provision relating to manner of disposal, and limits generator and transporter responsibility to ensuring that the facility has an appropriate permit for the type of waste being delivered.

*Fourth,* the legislative development of the current subsection (d)(2) supports our conclusion that current subsection (d)(2)(A) reaches disposal of wastes where a facility's permit does not authorize disposal of the hazardous waste at issue. As originally enacted in 1976, RCRA imposed criminal sanctions in the case of

(d) Any person who knowingly—

. . . . .

(2) disposes of any hazardous waste listed under this title without having obtained a permit *therefor* under this subtitle. . . .

Pub.L. No. 94–580, 90 Stat. 2795, 2812 (emphasis added). The only kind of permit issued under the statute is for hazardous waste disposal—thus "therefor" must mean a permit for disposal of the particular hazardous waste at issue. A contrary interpretation of subsection (d)(2) would render the word "therefor" redundant or meaningless and is therefore to be avoided. *United States v. Victoria–Peguero,* 920 F.2d 77, 81 (1st Cir.1990); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985). While the "therefor" was not carried into the current statute, there is not the slightest indication anywhere in the legislative history that adoption of the current "without a permit" language was meant to *restrict* the reach of subsection (d)(2)(A) to situations where the facility is entirely without a permit.

Finally, appellants urge that they could not have reasonably anticipated the charged interpretation of the statute, and that the ambiguity should be resolved in favor of lenity. Public welfare statutes, however, are not to be construed narrowly but rather to effectuate the regulatory pur-

pose. *United States v. Johnson & Towers, Inc.*, 741 F.2d at 666, and cases cited. We hold that appellants were properly indicted under subsection (d)(1) and subsection (d)(2)(A) for the conduct charged.

### D. *The Responsible Corporate Officer Doctrine*

D'Allesandro, the President and owner of MacDonald & Watson, contends that his conviction under RCRA, § 3008(d)(1), 42 U.S.C. § 6928(d)(1), must be vacated because the district court incorrectly charged the jury regarding the element of knowledge in the case of a corporate officer.[12] Section 3008(d)(1) penalizes "Any person who.... (1) *knowingly* transports or causes to be transported any hazardous waste identified or listed under this subchapter.... to a facility which does not have a permit....". (Emphasis supplied.) In his closing, the prosecutor conceded that the government had "no direct evidence that Eugene D'Allesandro actually knew that the Master Chemical shipments were coming in," i.e., were being transported to the Poe Street Lot under contract with his company. The prosecution did present evidence, however, that D'Allesandro was not only the President and owner of MacDonald & Watson but was a "hands-on" manager of that relatively small firm. There was also proof that that firm leased the Poe Street Lot from NIC, and managed it, and that D'Allesandro's subordinates had contracted for and transported the Master Chemical waste for disposal at that site. The government argued that D'Allesandro was guilty of violating § 3008(d)(1)

because, as the responsible corporate officer, he was in a position to ensure compliance with RCRA and had failed to do so even after being warned by a consultant on two earlier occasions that other shipments of toluene-contaminated soil had been received from other customers, and that such material violated NIC's permit. In the government's view, any failure to prove D'Allesandro's actual knowledge of the Master Chemical contract and shipments was irrelevant to his criminal responsibility under § 3008(d)(1) for those shipments.

The court apparently accepted the government's theory. It instructed the jury as follows:

> When an individual Defendant is also a corporate officer, the Government may prove that individual's knowledge in either of two ways. The first way is to demonstrate that the Defendant had actual knowledge of the act in question. The second way is to establish that the defendant was what is called a responsible officer of the corporation committing the act. In order to prove that a person is a responsible corporate officer three things must be shown.

> First, it must be shown that the person is an officer of the corporation, not merely an employee.

> Second, it must be shown that the officer had direct responsibility for the activities that are alleged to be illegal. Simply being an officer or even the president of a corporation is not enough. The Government must prove that the person

---

**12.** After the court's charge, D'Allesandro objected to the corporate responsibility instruction but not on the ground now raised, namely, the court's failure to require proof of actual knowledge. D'Allesandro thus failed to comply with Fed.R.Crim.P. 30 requiring both an objection and statement of "the matter to which he objects and the grounds of his objection." However, D'Allesandro raised the relevant point at the hearing on his motion for judgment of acquittal at the close of the government's case in chief. He there urged that in the absence of proof of knowledge, the government's attempt to proceed against him under the responsible corporate officer doctrine was improper. In these circumstances, and given the fact that the instruction as given failed to require proof of an essential

element, we conclude the question is now properly before us. *See Leary v. United States*, 395 U.S. 6, 32, 89 S.Ct. 1532, 1546, 23 L.Ed.2d 57 (1969) (a failure to object to unconstitutional jury instructions was sufficiently preserved by objection to same issue in moving for a directed verdict and, later, for a new trial); *Screws v. United States*, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) (failure to instruct properly on intent so egregious as to excuse failure to object). *See also Francis v. Franklin*, 471 U.S. 307, 313–18, 105 S.Ct. 1965, 1970–73, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

had a responsibility to supervise the activities in question.

And the third requirement is that the officer must have known or believed that the illegal activity of the type alleged occurred.

The court's phrasing of the third element at first glance seems ambiguous: it could be read to require actual knowledge of the Master Chemical shipments themselves. We are satisfied, however, that the court meant only what it literally said: D'Allesandro must have known or believed that illegal shipments *of the type* alleged had previously occurred. This tied into evidence that D'Allesandro had been advised of two earlier shipments of toluene-contaminated waste, and was told that such waste could not legally be received. For the court to require a finding that D'Allesandro knew of the alleged shipments themselves (i.e., the Master Chemical shipments), would have duplicated the court's earlier instruction on actual knowledge, and was not in accord with the government's theory.[13]

■ D'Allesandro challenges this instruction, contending that the use of the "responsible corporate officer" doctrine is improper under § 3008(d)(1) which expressly calls for proof of knowledge, i.e., requires *scienter*. The government responds that the district court properly adapted the responsible corporate officer doctrine traditionally applied to strict liability offenses to this case, instructing the jury to find knowledge "that the illegal activity of the *type alleged* occurred,"—a finding that, together with the first two, made it reasonable to infer knowledge of the particular

violation. We agree with D'Allesandro that the jury instructions improperly allowed the jury to find him guilty without finding he had actual knowledge of the alleged transportation of hazardous waste on July 30 and 31, 1986, from Master Chemical Company, Boston, Massachusetts, to NIC's site, knowledge being an element the statute requires.[14] We must, therefore, vacate his conviction.

■ The seminal cases regarding the responsible corporate officer doctrine are *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). These cases concerned misdemeanor charges under the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, 21 U.S.C. §§ 301–392, as amended, relating to the handling or shipping of adulterated or misbranded drugs or food. The offenses alleged in the informations failed to state a knowledge element, and the Court found that they, in fact, dispensed with a *scienter* requirement, placing "the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." *Dotterweich*, 320 U.S. at 277, 64 S.Ct. at 135. The Court in *Park* clarified that corporate officer liability in that situation requires only a finding that the officer had "authority with respect to the conditions that formed the basis of the alleged violations." But while *Dotterweich* and *Park* thus reflect what is now clear and well-established law in respect to public welfare statutes and regulations lacking an express knowledge or other *scienter* re-

---

13. Thus the prosecutor said, in his closing, "We can concede, Ladies and Gentlemen, that we have no direct evidence Eugene D'Allesandro ... actually knew that the Master Chemical shipments were coming in. But there is another way the Government can show that Eugene D'Allesandro was responsible for these shipments. The court will tell you what the law is but listen for the court's instruction that a corporate officer who is in a position in a company to insure that these types of actions don't occur and who knew that the company was engaged in such types of activities and did nothing to stop it can be held responsible for these actions."

14. The actual words of D'Allesandro's Count One indictment read as follows: "On or about July 30, 1986, in the District of Rhode Island ... Eugene K. D'Allesandro ... did knowingly transport and cause to be transported hazardous waste, namely toluene and soil contaminated with toluene, from Master Chemical Company, Boston, Massachusetts, to Narragansett Improvement Company, a facility which had neither interim status nor a permit ... to treat, store or dispose of such waste." D'Allesandro's indictment under Count Two is the same, except it alleges that the knowing transportation occurred on or about July 31, 1986.

quirement, we know of no precedent for failing to give effect to a knowledge requirement that Congress has expressly included in a criminal statute. *Park*, 421 U.S. at 674, 95 S.Ct. at 1912. Especially is that so where, as here, the crime is a felony carrying possible imprisonment of five years and, for a second offense, ten.

 The district court, nonetheless, applied here a form of the responsible corporate officer doctrine established in *Dotterweich* and *Park* for *strict liability* misdemeanors, as a substitute means for proving the explicit knowledge element of this RCRA felony, 42 U.S.C. § 6928(d)(1). As an alternative to finding actual knowledge, the district court permitted the prosecution to constructively establish defendant's knowledge if the jury found the following: (1) that the defendant was a corporate officer; (2) with responsibility to supervise the allegedly illegal activities; and (3) knew or believed "that the illegal activity of the type alleged occurred." As previously stated, the third element did not necessitate proof of knowledge of the Master Chemical shipments charged in the indictment, but simply proof of earlier occasions when D'Allesandro was told his firm had improperly accepted toluene-contaminated soil.

Contrary to the government's assertions, this instruction did more than simply permit the jury, if it wished, to infer knowl-

edge of the Master Chemical shipments from relevant circumstantial evidence including D'Allesandro's responsibilities and activities as a corporate executive. With respect to circumstantial evidence, the district court properly instructed elsewhere that knowledge did not have to be proven by direct evidence but could be inferred from the defendant's conduct and other facts and circumstances. The court also instructed that the element of knowledge could be satisfied by proof of willful blindness.[15] These instructions allowed the jury to consider whether relevant circumstantial evidence established that D'Allesandro actually knew of the charged Master Chemical shipments. These would have sufficed had it merely been the court's purpose to point out that knowledge could be established by circumstantial evidence, although the court could, had it wished, have elaborated on the extent to which D'Allesandro's responsibilities and duties might lead to a reasonable inference that he knew of the Master Chemical transaction.

 Instead, the district court charged, in effect, that proof that D'Allesandro was a responsible corporate officer would conclusively prove the element of his knowledge of the Master Chemical shipments. The jury was told that knowledge could be

---

**15.** The court instructed the jury generally regarding the element of knowledge as follows:

An act is said to be done knowingly if it is done voluntarily and intentionally and not because of ignorance, mistake, accident or some other reason. The requirement that an act be done knowingly is designed to insure that a Defendant will not be convicted for an act that he did not intend to commit or the nature of which he did not understand.

Proof that a Defendant acted knowingly or with knowledge of a particular fact does not require direct evidence of what was in that Defendant's mind. Whether a Defendant acted knowingly or with knowledge of a particular fact may be inferred from that Defendant's conduct, from that Defendant's familiarity with the subject matter in question or from all of the other facts and circumstances connected with the case.

In determining whether a Defendant acted knowingly, you also may consider whether the Defendant deliberately closed his eyes to what otherwise would have been obvious. If

so, the element of knowledge may be satisfied because a Defendant cannot avoid responsibility by purposefully avoiding learning the truth. However, mere negligence or mistake in not learning the facts is not sufficient to satisfy the element of knowledge.

*See generally United States v. Cincotta,* 689 F.2d 238, 243 n. 2 (1st Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982) ("The conscious avoidance principle means only that specific knowledge may be inferred when a person knows other facts that would induce most people to acquire the specific knowledge in question.... Evidence of conscious avoidance is merely circumstantial evidence of knowledge...."); *United States v. Jewell,* 532 F.2d 697, 700 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Rivera,* 926 F.2d 1564, 1571 (11th Cir.1991) ("deliberate ignorance and positive knowledge are equally culpable"). *See also United States v. Sanchez–Robles,* 927 F.2d 1070, 1073–75 (9th Cir.1991).

proven "in either of two ways." Besides demonstrating actual knowledge, the government could simply establish the defendant was a responsible corporate officer—the latter by showing three things, none of which, individually or collectively, necessarily established his actual knowledge of the illegal transportation charged. Under the district court's instruction, the jury's belief that the responsible corporate officer lacked actual knowledge of, and had not willfully blinded himself to, the criminal transportation alleged would be insufficient for acquittal so long as the officer knew or even erroneously believed that illegal activity of the same type had occurred on another occasion.

We have found no case, and the government cites none, where a jury was instructed that the defendant could be convicted of a federal crime *expressly requiring knowledge as an element*, solely by reason of a conclusive, or "mandatory" presumption of knowledge of the facts constituting the offense. *See Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (per curiam); *Francis v. Franklin*, 471 U.S. 307, 314 & n. 2, 105 S.Ct. 1965, 1971 & n. 2, 85 L.Ed.2d 344 (1985); *Hill v. Maloney*, 927 F.2d 646, 648 & n. 3 (1st Cir.1990); *see also Contract Courier Services, Inc. v. Research and Special Programs Admin., U.S. Dept. of Transportation*, 924 F.2d 112, 114 (7th Cir.1991); *cf. Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). The government's primary reliance on the Third Circuit's more limited decision in *Johnson & Towers*, 741 F.2d 662, 670, is misplaced. There, the court of appeals concluded that "knowingly" applies to all elements of the offense, including permit status, in RCRA § 3008(d)(2)(A). The court of appeals advised that proof of knowledge of the permit requirement and the nonexistence of the permit did not impose a great burden because such knowledge might, in a proper case, be inferred. Relying on the Supreme Court's decision in *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971),[16] the court of appeals emphasized "that under certain regulatory statutes requiring 'knowing' conduct, the government need prove only knowledge of the actions taken and not of the statute forbidding them." *Johnson & Towers*, 741 F.2d at 669;[17] *see also United States v. Dee*, 912 F.2d 741, 745–46 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991) (knowledge of RCRA's prohibitions may be presumed; instruction that defendants had to know substances involved were chemicals, without requiring knowledge they were hazardous, was harmless error); *United States v. Sellers*, 926 F.2d 410, 416 (5th Cir.1991) (assuming *arguendo* that district court erred in failing to instruct that government must prove defendant knew waste was hazardous under 42 U.S.C. § 6928(d)(2)(A), error was not plain). Thus, this case supports only the position that knowledge of the law

---

**16.** In that case, the Supreme Court held that a statute regarding failure to record shipment of chemicals, and specifically proscribing "knowing violation of regulations" did not require knowledge of the regulations. The Court clearly stated that "knowledge of the shipment of the dangerous materials is required." 402 U.S. at 560, 91 S.Ct. at 1699. Thus, the Court reasoned that handlers of dangerous materials may be subject to different standards than others; it was only *knowledge of the regulations* that the Court found could be presumed. 402 U.S. at 565, 91 S.Ct. at 1701.

**17.** The government also cites the *Hayes* and *Hoflin* decisions in support of its position. In *Hoflin*, as discussed above, the Ninth Circuit disagreed with the *Johnson & Towers* court and decided that knowledge of the nonexistence of a permit was not necessary for conviction under RCRA, § 3008(d)(2)(A). The *Hoflin* court, however, found that knowledge of the hazardous nature of the material disposed must be proven, and did not suggest that such knowledge could be irrebuttably presumed for corporate officers as the court instructed here. In *Hayes*, also discussed above, the Eleventh Circuit found knowledge of the nonexistence of a permit a required element under RCRA, § 3008((d)(1). There, the court of appeals simply found, "in this regulatory context a defendant acts knowingly if he willfully fails to determine the permit status of the facility." *Hayes*, 786 F.2d at 1504 (*citing Boyce Motor Lines v. United States*, 342 U.S. 337, 342, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952)).

may be inferred,[18] and does not address knowledge of acts.

The government's citation of three additional cases in support of its assertion that other courts have sanctioned application of instructions such as those given here is also incorrect. In the first, *United States v. Frezzo Brothers, Inc.*, 602 F.2d 1123 (3d Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), the defendants were convicted of willfully or negligently discharging pollutants into a navigable water of the United States without a permit in violation of 33 U.S.C. §§ 1311(a), 1319(c). Since defendants could have been found guilty solely based on negligence, no presumption of knowledge was necessary to sustain the convictions. Likewise, in the second, *United States v. Cattle King Packing Co., Inc.*, 793 F.2d 232 (10th Cir.), *cert. denied*, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986), the responsible corporate officer instruction was sufficient only to put to the jury the issue of the defendant's responsibility for meat inspection violations, which did not require *scienter*. The jury was also, however, instructed that it must find defendant had intent to defraud for purposes of convicting on charges of fraudulent violations, and another instruction specifically instructed that for all counts but one "the crimes charged in this indictment require proof of specific intent before the defendants can be convicted." *Cattle King*, 793 F.2d at 241; *see also United States v. Hiland*, 909 F.2d 1114, 1128 & n. 18 (8th Cir.1990).

Finally, in the third, *United States v. Andreadis*, 366 F.2d 423 (2d Cir.1966), *cert.*

*denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967), the defendant president of a company was convicted of fraud in advertising and contested the sufficiency of the evidence. Regarding the element of knowledge that the advertising claims were false, the court of appeals concluded that the jury could "infer" that the defendant had the requisite knowledge of the advertisements' falsity, 366 F.2d at 430. The court's citation to cases concerning fraudulent intent makes clear that its use of the word "infer" relates simply to an inference based on circumstantial evidence. *See United States v. Lichota*, 351 F.2d 81, 90 (6th Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966). Having held that the evidence of knowledge was sufficient, the court alternatively noted that the defendant had an affirmative duty to insure that the advertising agency's claims on behalf of his product were true, and might, "having failed totally to discharge this responsibility in even the slightest measure," therefore be charged with knowledge. *Andreadis*, 366 F.2d at 430. We understand the *Andreadis* and other courts to simply state that willful blindness may be inferred from circumstantial evidence, and do not think such cases sanction an independent instruction for jury findings concerning *scienter*. *See Stone v. United States*, 113 F.2d 70, 75 (6th Cir.1940) ("Scienter may be inferred where the lack of knowledge consists of ignorance of facts which any ordinary person under similar circumstances should have known.").[19]

---

**18.** Further, the court of appeals in *Johnson & Towers* did not indicate how knowledge may be inferred. To the extent the fact of permit non-existence may be inferred, such inference may be from willful blindness or other circumstantial evidence. The court of appeals did not indicate that such facts could be irrebuttably presumed based on corporate position and facts unrelated to the specific alleged illegal activity charged.

**19.** In *United States v. Avant*, 275 F.2d 650, 653 (D.C.Cir.1960), the court ordered a new trial due to jury instruction defects, noting as follows:

A showing of recklessness standing alone does not, as the trial judge's charge tended to suggest, establish knowledge as a matter of law.

However, the jury is permitted to impute knowledge of the falsity of the statements to the accused, not as a matter of law but as a consequence of inferences reasonably drawn from the facts shown. 'While there is no allowable inference of knowledge from the mere fact of falsity, there are many cases where from the actor's special situation and continuity of conduct an inference that he did know the untruth of what he said * * * may legitimately be drawn.' *Bentel v. United States*, 2 Cir., 13 F.2d 327, 329, certiorari denied *Amos v. United States*, 1926, 273 U.S. 713 [47 S.Ct. 109, 71 L.Ed. 854]. This is more particularly allowable when the actors or utterers are persons 'in a far better position to judge than the unsophisticated public to

■ We agree with the decisions discussed above that knowledge may be inferred from circumstantial evidence, including position and responsibility of defendants such as corporate officers, as well as information provided to those defendants on prior occasions. Further, willful blindness to the facts constituting the offense may be sufficient to establish knowledge. However, the district court erred by instructing the jury that proof that a defendant was a responsible corporate officer, as described, would suffice to conclusively establish the element of knowledge expressly required under § 3008(d)(1). Simply because a responsible corporate officer believed that on a prior occasion illegal transportation occurred, he did not necessarily possess knowledge of the violation charged. In a crime having knowledge as an express element, a mere showing of official responsibility under *Dotterweich*

> whom they sold * * *.' *Van Riper v. United States,* 2 Cir., 13 F.2d 961, 964, certiorari denied, *Ackerson v. United States,* 1926, 273 U.S. 702 [47 S.Ct. 102, 71 L.Ed. 848]. This concept has been consistently applied in federal courts.
>
> (Case name italicization added).

**20.** We also must consider whether the constitutional error in this case was harmless beyond a reasonable doubt. *See Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 1262, 113 L.Ed.2d 302 (1991) (opinion of Rehnquist, C.J.); *Carella v. California,* 491 U.S. 263, 266, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989); *Rose v. Clark,* 478 U.S. 570, 576–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986); *Francis v. Franklin,* 471 U.S. 307, 325–26, 105 S.Ct. 1965, 1977, 85 L.Ed.2d 344 (1985); *Hill,* 927 F.2d at 648. We conclude that it was not. The prosecutor conceded, in closing, that the government had no direct evidence of D'Allesandro's knowledge of the Master Chemical shipments, and urged the jury to consider the responsible corporate officer doctrine as a basis for conviction. *See supra,* note 13. Thus, the government's theory of the case relied specifically on the erroneous instruction establishing a mandatory presumption as to the *scienter* element of the offense, based on the enumerated predicate facts. We cannot say that these predicate facts—(1) status as an officer of the corporation; (2) direct responsibility for the activities that are alleged to be illegal; and (3) knowledge or belief that the illegal activity of the type alleged occurred—conclusively establish knowledge such that no rational jury could find that D'Allesandro did not have knowledge in this case. While the district court could properly have instructed the jury that it could

and *Park* is not an adequate substitute for direct or circumstantial proof of knowledge.[20]

### E. *CERCLA § 103(b)(3)*

CERCLA imposes criminal sanctions upon any person in charge of a facility from which a "reportable quantity" of a hazardous substance is released who fails to immediately notify the appropriate federal agency. CERCLA, § 103(b)(3), 42 U.S.C. § 9603(b)(3) (1982 & Supp. V 1987).[21] The default reportable quantity for a hazardous substance is one pound, CERCLA, § 102(b), 42 U.S.C. § 9602(b), unless superseded by regulations promulgated pursuant to CERCLA, § 102(a), 42 U.S.C. § 9602(a). Appellants MacDonald & Watson and NIC contend that the indictment and jury instructions improperly established the reportable quantity of soil contaminated with toluene as one pound.[22] For this reason,

*infer* knowledge from the circumstantial evidence, in this case the inference is not so "overpowering" as to render the error harmless beyond a reasonable doubt. *See Rose,* 478 U.S. at 580–81, 106 S.Ct. at 3107–08.

**21.** This section provides, in pertinent part:

> (b) Any person—
> (3) in charge of a facility from which a hazardous substance is released ... in a quantity equal to or greater than that determined pursuant to section 102 of this title who fails to notify immediately the appropriate agency of the United States Government as soon as he has knowledge of such release ... shall, upon conviction be fined in accordance with the applicable provisions of title 18 of the United States Code or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both....

**22.** Count Seventeen of the Indictment charges:

> On or about and between July 30, 1986 and July 31, 1986 ... a quantity equal to or greater than one pound of hazardous substance, as defined in Title 42, United States Code, Section 9602, namely soil contaminated with toluene, was released from a facility into the environment....

> The district court charged the jury:
> In order to establish that either or both of the Defendants is guilty of violating this statute as alleged in Count Seventeen, the Government must prove.... beyond a reasonable doubt that the amount of the hazardous substance released was in excess of what's called the reportable quantity. In other words, that it

they seek reversal of CERCLA convictions. The government responds that it properly charged, and the district court correctly instructed that the reportable quantity for soil contaminated with commercial chemical product toluene (hereinafter "toluene") [23] is one pound. Alternatively, the government argues that, since the evidence was undisputed that ten large truckloads of the hazardous waste was released, any error in the charge and jury instructions was harmless. We hold that the one pound reportable quantity set out in the indictment and charged in the court's instructions was incorrect, but constituted harmless error.

We turn first to a determination of the reportable quantity proper for this hazardous substance. The term "hazardous substances," for purposes of CERCLA reporting, is defined in CERCLA, § 101(14)(B), 42 U.S.C. § 9601(14)(B), to include all RCRA hazardous wastes as well as additional materials listed as hazardous wastes pursuant to CERCLA, § 102(a), 42 U.S.C. § 9602(a). EPA regulations promulgated under RCRA prior to the Master Chemical cleanup listed toluene as a hazardous waste, 40 C.F.R. § 261.33(f). EPA also promulgated regulations pursuant to § 102(a) prior to the Master Chemical cleanup which establish a reportable quantity for toluene of 1,000 pounds. 40 C.F.R. § 302.4, 50 Fed.Reg. 13,474, 13,498 (April 4, 1985). The RCRA regulations also provide that soil contaminated with toluene is a RCRA hazardous waste, which is, therefore, subject to CERCLA reporting requirements. 40 C.F.R. § 261.33(d). It is necessary to resolve, first, whether *toluene* or *toluene-contaminated* soil is the relevant hazardous waste for release reporting purposes here, and second, the reportable quantity of that waste.

Appellants contend that reporting is required only where 1,000 pounds of

*toluene* is released, because CERCLA's "no-mixing" rule provides that at the time of the release, "[r]eleases of mixtures and solutions are subject to these notification requirements only where a component hazardous substance of the mixture or solution is released in a quantity equal to or greater than its reportable quantity." 50 Fed.Reg. 13,474, 13,475 (April 4, 1985). *See also* 40 C.F.R. § 302.6(b)(1) (1989). This contention is incorrect. EPA clearly stated in the preamble to the "mixture rule" regulations that the rule does not apply where the concentration of the hazardous substance in the mixture is not known:

> [F]or CERCLA purposes, the [CERCLA] mixture rule applies to ... RCRA F and K waste streams (all of which tend to be mixtures) ... if the concentrations of all the hazardous substances in the waste are known. If the concentrations of the substances are unknown, the [reportable quantity] of the waste or unlisted waste applies.... [I]f the concentrations of the hazardous substances contained in the mixture are known, waste streams should be treated like any other mixture. If the releaser does not know the composition of the listed waste stream, EPA agrees that applying the [reportable quantity] of the entire waste stream is the only reasonably conservative alternative.

50 Fed.Reg. 13,463. In the present case, the concentration of toluene in the soil was unknown.[24] The mixture rule is, therefore, inapplicable. A different result would, of course, undermine the CERCLA policy requiring reporting of dangerous releases of hazardous substances. If the concentration of the hazardous constituent in a mixture is unknown, it is impossible to prove the quantity of the constituent that is released, regardless of the magnitude of mixture released. Congress and the EPA

was one pound or more.... [S]oil contaminated with commercial chemical product toluene is a hazardous substance whether it contains any other substance....

**23.** We refer to toluene as meaning commercial chemical product toluene as distinguished from spent solvent toluene, which is treated separately under the regulations.

**24.** "CERCLA does not itself impose any testing requirements." 50 Fed.Reg. 13,463 (April 4, 1985). Yet, 1984 test data at various locations at the Master Chemical site showed toluene at 360,000 parts per million ("ppm") in a groundwater sample, and at 9,300 ppm, 6.4 ppm, 180 ppm and 2.9 ppm in soil samples.

could not have intended, and did not intend, that all releases of such mixtures may go unreported.

■ Having established that the amount of toluene-contaminated soil that was released (rather than toluene alone) is the relevant hazardous waste triggering the reporting obligation, the next question is the reportable quantity of toluene-contaminated soil. The government argues that, because soil contaminated with commercial chemical product toluene is an independent RCRA hazardous waste for which EPA has established no independent reportable quantity, the reportable quantity is one pound pursuant to CERCLA § 102(b). While there is some basis for this contention, it leads to the totally illogical result that one pound of toluene diluted by soil must be reported whereas only 1,000 pounds of pure toluene need be. We conclude that the reportable quantity for soil contaminated with toluene is the reportable quantity for toluene alone—1,000 pounds.

The fundamental concern underlying release reporting is the danger associated with the release of a listed hazardous waste. The reportable quantity for listed hazardous wastes is determined "based on chemical toxicity." 40 C.F.R. § 302.5 (1989). The primary concern with the amount of the listed hazardous waste released is reflected in the "no-mixing" rule, which provides that released mixtures need be reported only when a reportable quantity of the component hazardous waste is released. Here, because the concentration of the toluene in the soil was unknown, the amount of toluene released could not be shown.

To resolve this problem, it makes no sense—given the EPA's determination that only 1,000 pounds or more of toluene need be reported—to require the reporting of one pound of toluene when mixed with soil.

To the contrary, since soil itself is non-reportable, and since any amount of soil when mixed with toluene lowers the proportion of the latter in the total mix, the EPA's purpose is fully, and conservatively served simply by establishing the reportable quantity of the mixture at 1,000 pounds, the same as toluene. To be sure, as the concentration of toluene is not known, there is no principled way, based on toxicity, to determine a reportable quantity *greater* than 1,000 pounds. But anything less assures full compliance. The EPA appears to have recognized this in its regulations:

> Finally, the Agency wishes to clarify that, except as noted below, all hazardous wastes newly designated under RCRA will have a statutorily imposed [reportable quantity] of one pound until adjusted by regulation under CERCLA. *See* CERCLA section 102. *If a newly listed hazardous waste stream has only one constituent of concern, the waste will have the same [reportable quantity] as that of the constituent.* (The [reportable quantity] to be considered for this purpose would be the final [reportable quantity] of the constituent, whether statutorily imposed or by regulation.)

51 Fed.Reg. 6539 (Feb. 25, 1986). (Emphasis supplied).

Examination of the RCRA scheme establishing that a listed hazardous waste mixed with "soil, water or other debris" is itself a hazardous waste also reveals that the government's argument here is flawed. *See* 40 C.F.R. § 261.33(d).[25] The government relies on a technical argument that § 261.33(d) designates independent hazardous wastes—for which EPA established no independent reportable quantity—and the reportable quantity must therefore be one pound under CERCLA § 102(b). EPA, however, could not have intended that 40 C.F.R. § 261.33 establish independent haz-

---

**25.** 40 C.F.R. § 261.33 provides, in pertinent part:

> The following materials or items are hazardous wastes if and when they are discarded or intended to be discarded as described in § 261.2(a)(2)(i) ...

> (d) Any residue or contaminated soil, water or other debris resulting from the cleanup of a spill into or on any land or water of any commercial chemical product or manufacturing chemical intermediate having the generic name listed in paragraph (e) or (f) of this section....

ardous wastes for CERCLA reporting purposes. Under the RCRA regulatory scheme, wastes are deemed hazardous if they either (1) exhibit certain characteristics which are known to be correlated with a danger to human health or the environment; or (2) appear on a list of individual wastes found to pose certain dangers. *See* 40 C.F.R. Subparts B, C and D, §§ 261.10 *et seq.* EPA addressed in 40 C.F.R. § 261.33(d) a possible contention that a mixture of a listed hazardous waste and soil is an independent waste which, in its own right, is neither a "characteristic" hazardous waste nor a listed hazardous waste. Since listed hazardous wastes may not lose their dangerous nature through mixture with soil, water or other debris,[26] EPA simply deemed such contaminated media to also be hazardous wastes. We think that EPA did not believe that, in closing this loophole, it would establish new and independent hazardous wastes consisting of each listed hazardous waste mixed with receiving media which would then require establishment of an independent reportable quantity under CERCLA § 102(b), else that reportable quantity of the mixture would remain one pound.[27] To find that toluene-contaminated soil is an independent hazardous waste with a default reportable quantity of one pound would be to truly elevate linguistic form over substance.

■ We conclude that the reportable quantity for the toluene-contaminated soil was 1,000 pounds. The indictment charging that a reportable quantity of one pound of toluene-contaminated soil was not reported and the jury instructions to the same effect were, nevertheless, harmless error. Fed.R.Crim.P. 52(a). It was never a subject of dispute that the toluene-contaminated soil was delivered to the Poe Street Lot in other than nine 25–yard dump trucks and one 20–yard dump truck. We see no basis on which it could be rationally concluded by any juror that less than 1,000 pounds of contaminated soil was released. *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987); *Rose v. Clark*, 478 U.S. 570, 576–79, 106 S.Ct. 3101, 3105–07, 92 L.Ed.2d 460 (1986). Likewise, we find no substance in appellants' argument that the indictment was constitutionally flawed because it failed to allege an essential element of the offense. *See Portnoy v. United States*, 316 F.2d 486, 488 (1st Cir.), *cert. denied*, 375 U.S. 815, 84 S.Ct. 48, 11

**26.** EPA surely recognized that a listed hazardous waste, when "released," ultimately finds its way into some receiving media, such as "soil, water or other debris."

**27.** The absurdity of the government's position is evident in recognizing the impossibility of establishing a principled reportable quantity for "independent hazardous wastes" under 40 C.F.R. § 261.33(d) based on toxic danger, where the concentration of the hazardous constituent is unknown. (Of course, the "mixing rule" addresses any case where the concentration is known.) It would be silly to establish an arbitrary reportable quantity for "toluene in soil," or for toluene in any other inert medium. It is simply unbelievable that EPA intended to so multiply the number of hazardous wastes for which reportable quantities must be established through the § 261.33(d) loophole-closing provision. EPA's statement in the preamble to the rule establishing CERCLA reportable quantities flatly contradicts the logic of the government's argument:

> Many commenters objected to the Agency's proposal to establish a single RQ for each hazardous substance. It was suggested that either (1) the Agency should develop several RQs for each hazardous substance, for exam-ple, one RQ for each of the various environmental media (air, water, soil) into which a release might occur, or (2) the Agency should base the adjusted RQ for each substance on the most likely medium of release rather than on the most sensitive environmental trigger (as is currently done).... As has been stated, the RQs are not intended to represent judgments by the Agency as to the specific degree of hazard associated with certain releases..... The single RQ approach was adopted to provide a relatively simple reporting system that does not unduly burden either EPA or the regulated community.... Section 102(a) of CERCLA expressly authorizes the Administrator to set a single quantity for each hazardous substance, and the legislative history emphasizes the virtues of simplicity and administrative convenience. (*see* Sen.Rep. 848, 96th Cong., 2d Sess. 29 (1980). Moreover, *the Agency simply does not have the resources to obtain the vast quantity of technical data required to develop RQs that, on the one hand, are tailored to fit every release situation, and that, on the other hand are consistent, equitable, and adequately protective of public health and the environment.*

(Emphasis supplied). 50 Fed.Reg. 13,466 (April 4, 1985).

L.Ed.2d 50 (1963) ("It is a cardinal principle of our criminal law that an indictment is sufficient which apprises a defendant of the crime with which he is charged so as to enable him to prepare his defense and to plead judgment of acquittal or conviction as a plea to a subsequent prosecution for the same offense.") We see no basis on which the difference between 1,000 pounds and one pound would, in these circumstances, have affected defendants' ability to defend.

### F. *Joinder Under Fed.R.Crim.P. 8(b)*

Appellants next contend that the district court committed reversible error by failing to grant their motion for severance because counts of the indictment were improperly joined under Fed.R.Crim.P. 8(b).[28] Rule 8(b) permits joinder of defendants where the offenses are part of "the same series of acts or transactions."[29] We review the correctness of Rule 8 joinder *de novo. United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).

Appellants emphasize that the counts in the first revised indictment on which the trial commenced included the Master Chemical, creosote, xylene and solid waste fraud counts, all of which were dropped either during or at the close of the government's case, except the Master Chemical counts. The creosote counts of the first revised indictment charged that, in September 1985, MacDonald & Watson, NIC, D'Allesandro and Slade, *inter alia*, violated 42 U.S.C. §§ 6928(d)(1) and (d)(2)(A) in connection with transportation and disposal of creosote and sand contaminated with creosote from Walpole Woodworkers, located in Harwichport, Massachusetts, without a permit at NIC. The xylene counts of the first revised indictment charged that, between January 1, 1984 and June 30, 1985, MacDonald & Watson, NIC, D'Allesandro, and Vincent Cinquegrano knowingly disposed of xylene and xylene sludge without a permit by dumping the waste into piles of soil at NIC's property at the Poe Street facility, in violation of 42 U.S.C. § 6928(d)(2)(A). The solid waste fraud counts of the first revised indictment related to Rhode Island's solid waste management facility's licensing requirements. The indictment charged that MacDonald & Watson, NIC, D'Allesandro, and Cinquegrano devised a scheme to defraud Rhode Island and Providence Plantations out of its right to collect license fees for a landfill facility in Johnstown, Rhode Island and for the Poe Street facility. The indictment also charged that, as part of this scheme, the defendants committed fraud by accepting waste from a number of sources at the Johnstown and Poe Street facilities for disposal, and transferring some of this material from Poe Street to Johnstown. The indictment charged that neither MacDonald & Watson nor NIC had a permit to operate a transfer station (a facility where collection vehicles transfer solid waste to haulage vehicles for transportation to a final disposal site), at the Poe Street site or a solid waste management facility at the Johnstown site.

Appellants contend these counts were improperly joined, and they were prejudiced, as the counts were not based on the same series of acts or transactions[30] because they occurred over a lengthy period of time, involved different chemicals, different generators, different participants, and different criminal activity. They emphasize that the Master Chemical, creosote and xylene counts involved three separate

---

**28.** Appellants do not argue on appeal that the district court abused its discretion under Fed.R. Crim.P. 14 by failing to sever properly joined counts upon a strong showing of prejudice. *See United States v. Luna*, 585 F.2d 1, 4–5 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978).

**29.** Rule 8(b) provides:
 **(b) Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to

have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**30.** It is uncontested that the counts in the first revised indictment included more than a single act or transaction.

transactions, without any interconnecting common scheme or plan, which occurred in mid–1986, September 1985, and June 1985, respectively. Appellants also contend that the solid waste fraud counts were unrelated to any other counts in that: (1) two appellants, Ritarossi and Slade, were unimplicated; (2) the fraud was alleged to have occurred from 1983 to 1986 (largely prior to the other counts); (3) the only common site involved was the Poe Street facility; and (4) the allegations concerned fraudulent failure to pay license fees to the State of Rhode Island for disposal of non-hazardous oil wastes, and were unrelated to improper disposal of hazardous wastes alleged in the remaining counts. The government does not contest any of appellants' distinctions, but responds that sufficiently overlapping facts and law for the various transactions justified joinder, as the defendants generally overlap in the various counts and the MacDonald & Watson/NIC relationship at the Poe Street facility is pertinent to all counts.

Joinder of defendants promotes judicial economy and also allows the jury to draw consistent conclusions about common factual questions. The rule balances these benefits against the "presumptive prejudice inherent in the consolidation of parties or offenses...." *United States v. Turkette*, 632 F.2d 896, 906 (1st Cir.1980), *rev'd on other grounds*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). *See United States v. Doherty*, 867 F.2d 47, 63 (1st Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989); *United States v. Arruda*, 715 F.2d 671, 678 (1st Cir.1983); *King v. United States*, 355 F.2d 700, 703–04 (1st Cir.1966); *see also United States v. Gomez–Pabon*, 911 F.2d at 860 n. 7. Central to application of Rule 8(b) is the meaning of the phrase "same series of acts or transactions." Appellants cite conspiracy as an interconnection between disparate acts justifying joinder under Rule 8(b). We have found transactions sufficiently interconnected to permit joinder of defendants where the seller of drugs was the same in both counts, though buyers

charged in the two sales were unrelated, *United States v. Barbosa*, 666 F.2d 704, 707–08 (1st Cir.1981); where conspirators stole police promotional exams on various occasions over six years, though those charged with receiving the exams were not related, *Doherty*, 867 F.2d at 63; and where defendants were charged as coconspirators, *Arruda*, 715 F.2d at 678. "Classic examples of such a benefit [to the court justifying joinder] are when there is an overlapping of issues, as, for example, when some defendants are charged with transporting stolen goods in interstate commerce and others are charged with receiving the goods, so stolen and transported." *King*, 355 F.2d at 704. Nevertheless, we have held that "something more than mere 'similar acts' " is required, *United States v. Turkette*, 632 F.2d at 907, and that "some relatedness between offenses is necessary for there to be a series of acts or transactions.... Relatedness of offenses can be established by demonstrating that essentially the same facts must be shown for each of the consolidated crimes." *Id.* at 907–08. In *Turkette*, we found joinder improper because "narcotics violations evidence was unnecessary to prove the arson-mail fraud and vice versa." *Id.* at 909.

■■■ Here, we think that Rule 8(b) joinder was proper. The Master Chemical creosote, xylene and solid waste fraud counts all were MacDonald & Watson transactions involving disposal of waste at the same site, involving largely the same MacDonald and Watson personnel, and occurring within a relatively short time frame. While no conspiracy was alleged here, we think that joinder is similarly appropriate where a corporation and its employees are alleged to have committed the same illegal acts involving the same corporate site on several occasions. As in a conspiracy case, the relationship between the defendants and their responsibilities in carrying out the alleged illegal activity would be the same in all cases, and the benefits of joinder—saving time and promoting consistency in the determination of common factual questions—apply.[31]

---

**31.** Appellants make additional arguments that

we reject summarily. They argue first that the

*Conclusion*

In sum, we *affirm* the convictions of Faust Ritarossi, Francis Slade and Mac-Donald & Watson. We *vacate* the convictions of Eugene D'Allesandro and of NIC and remand for a new trial or such other action as may be consistent herewith.

*So ordered.*

district court failed to strike hearsay testimony regarding the hole in the toluene tank. This was harmless error, as another witness independently testified that he saw the hole in the tank. Appellants also argue that the government's counsel made misstatements of facts during closing argument which require reversal. The prosecutor's statements reasonably reflect the trial evidence and any arguably marginal misstatements were, we believe, harmless error, especially given the court's instructions that statements by the lawyers are not evidence. *See United States v. Maccini,* 721 F.2d 840, 845–47 (1st Cir.1983).