UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard HEUER, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Eugene HOLDERNESS, Defendant–
Appellant.

Nos. 92–10545, 92–10546.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1993.

Decided Aug. 31, 1993.

N. Patrick Flanagan, III, Beckley, Singleton, De Lanoy, Jemison & List, Chartered, Reno, NV, for defendant-appellant Heuer.

C. Frederick Pinkerton, Reno, NV, for defendant-appellant Holderness.

John A. Bryson, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before: REINHARDT, TROTT, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Eugene Holderness and Richard Heuer worked for Hi–Shear Technology Corporation. These consolidated appeals involve the storage, transportation, and disposal of hazardous waste after Hi–Shear closed a facility which produced propellants in Saugus, California, and opened a new facility in Storey County, Nevada. Holderness and Heuer were convicted in connection with these activities of violations of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., and of making false statements under 18 U.S.C. § 1001. The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291.

Holderness was convicted of illegally storing hazardous waste from Saugus in the Storey facility without a permit, disposing of such waste in violation of a condition of a permit, and falsely representing that the material he stored and disposed of was a sample instead of waste. Heuer was convicted of making a false bill of lading that incorrectly described a shipment from Saugus to Storey as propellant instead of hazardous waste, which it was.

We affirm on all issues but one raised by Holderness. He contends that he was improperly charged under § 6928(d)(2)(B) with disposal of hazardous waste contrary to the conditions of an RCRA permit, because disposal only of waste generated at Storey was not a material condition of Hi–Shear's permit, which did allow open-burning of waste propellant at the Storey facility. This turns on whether § 6928(d)(2)(B), which requires a knowing violation of a material condition of an RCRA permit,[1] can be violated when the condition allegedly violated does not appear in the permit but is rather derived from the history of dealings between the defendant and environmental protection authorities. We hold the condition must be clear from the permit. Thus, we conclude that Holderness's

1. 42 U.S.C. § 6928(d) provides, in pertinent part:

(d) Criminal penalties
Any person who—

.    .    .    .    .

(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter—

(A) without a permit under this subchapter ...; or
(B) in knowing violation of any material condition or requirement of such permit;

.    .    .    .    .

shall, upon conviction, be subject to [fines, imprisonment or both].

conviction for disposal of hazardous waste in violation of a material condition cannot stand, as there is no condition in the permit for the Storey facility which unambiguously limits disposal to waste generated at Storey.

## I

Heuer and Holderness were high level management employees at Hi–Shear Technology Corporation, Inc., a propellant manufacturer, which had facilities in Saugus, California and Torrance, California.[2] When Hi–Shear moved its manufacturing facility from Saugus to Storey County, Nevada, Holderness became the manager of the Storey facility. As part of his duties, Holderness applied for a permit from the Nevada Department of Environmental Protection (NDEP)[3] for the disposal of explosive hazardous waste generated during Hi–Shear's manufacture of propellants. The application was rejected, but NDEP on February 16, 1988 issued a temporary permit to dispose of hazardous waste by open-burning at the Storey facility in order to minimize the risk of harm from *prolonged storage*.[4] Although Holderness was aware that he did not have a permit which allowed the storage or disposal at Storey of waste from the Saugus facility, he burned waste transported from Saugus in the burn pit at Storey. Heuer, the vice-president of operations in charge of Hi–Shear's shipping and receiving department, directed the transport of this waste from Saugus to Storey in Spring 1988.

NDEP conducted an unannounced inspection of the Storey facility on June 9, 1988. While on the premises, the inspection team was told by an employee that Hi–Shear had transported hazardous waste from California to Storey. NDEP rescinded Hi–Shear's temporary permit and formally notified Hi–Shear of numerous alleged violations. As part of an attempt to have the permit reinstated, Holderness directed the creation of a ·

backdated bill of lading for the waste transported from Saugus. This bill of lading, which was typed in July 1988 and dated April 27, 1988, contained a false entry which described M119 propellant waste material as a "gross sample." Heuer signed the bill of lading, and Holderness submitted it to NDEP.

Holderness and Heuer were each indicted on one count of making a false statement within the jurisdiction of the United States Environmental Protection Agency (EPA), in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2. Heuer was also indicted on one count of transporting hazardous waste without a manifest in violation of 42 U.S.C. § 6928(d)(5) and 18 U.S.C. § 2. In addition, Holderness was charged with one count of storing hazardous waste without a permit in violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2, and one count of disposing of hazardous waste in violation of a material condition of a permit, an offense under 42 U.S.C. § 6928(d)(2)(B) and 18 U.S.C. § 2.

Following a jury trial, Heuer was acquitted of transporting waste without a manifest, but convicted of making a false statement. Holderness was convicted on all counts. Both timely appeal their convictions.

## II

The indictment charges Holderness with unlawful activity with respect to two different waste management functions: storage (without a permit), and disposal (in violation of a material condition of a permit). Count Two concerns storage of hazardous waste, and charges that between April 27, 1988 and November 4, 1988, Holderness knowingly stored propellants and other explosive waste at the Storey facility without a storage permit or *interim status authorization* in violation of 42 U.S.C. § 6298(d)(2)(A). Count Three pertains to disposal, and alleges that

---

**2.** Because Heuer and Holderness challenge the sufficiency of the evidence of their offenses, the facts are set out in the light most favorable to the government. *See United States v. Bishop*, 959 F.2d 820, 829 (9th Cir.1992).

**3.** NDEP administers and enforces a hazardous waste management program pursuant to 42

U.S.C. § 6926, which authorizes the states to operate environmental protection programs in lieu of the federal program.

**4.** The original 90-day permit was extended with minor modifications for an additional 90 days on June 1, 1988.

Holderness knowingly disposed of hazardous waste in knowing violation of a material condition of a permit, 42 U.S.C. § 6928(d)(2)(B).

■ RCRA was enacted to address the problem of disposing of solid waste that is hazardous to public health and the environment. *See* 42 U.S.C. § 6902; *United States v. Hoflin,* 880 F.2d 1033, 1038 (9th Cir.1989), *cert. denied,* 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990). "Solid waste" is defined as "discarded material." 42 U.S.C. § 6903(27). EPA Regulations define "discarded material" as, among other things, any material that is "abandoned" by being disposed of, burned, or stored. 40 C.F.R. § 261.2(a)–(b). Particularly dangerous solid wastes are "hazardous," and persons generating hazardous waste must identify it as hazardous and provide for its proper transportation, treatment, storage, and disposal. 42 U.S.C. §§ 6903(5), 6922; 40 C.F.R. Part 262.

■ A "generator" of hazardous waste means "any person, *by site,* whose act or process produces hazardous waste...." 40 C.F.R. § 260.10 (emphasis added). "[A] generator may accumulate hazardous waste *on-site* for 90 days or less without a permit," 40 C.F.R. § 262.34(a) (emphasis added), but otherwise no hazardous waste may be stored, treated, or disposed of except at a facility for which EPA has granted a permit, 42 U.S.C. § 6925(a); 40 C.F.R. § 262.34(b). These provisions make it clear that an entity which generates hazardous waste at more than one site must have a permit for temporary accumulation at one site of waste that is produced at another site. Likewise, a generator may not transport hazardous waste except to a facility that has a permit to either store, treat, or dispose of hazardous waste. 42 U.S.C. § 6923(a)(4); 40 C.F.R. § 262.20(a)–(d).

An RCRA permit application consists of two parts. Part A describes the facility and identifies the activities requiring a permit. 40 C.F.R. § 270.13. Part B details the operation of storage, treatment, or disposal units and how compliance will be accomplished.

40 C.F.R. §§ 270.14–270.26. Operators of a proposed hazardous waste facility must submit both Parts A and B 180 days before construction is expected to begin, 40 C.F.R. §§ 270.1(b), 270.10(f), and may not commence construction or engage in any hazardous waste activities until the permit is received, 42 U.S.C. § 6925(a); 40 C.F.R. §§ 270.1(c), 270.10(f).

Certain facilities which qualify for "interim status" are "treated as having been issued [a] permit" until their application has been acted upon. 42 U.S.C. § 6925(e). Interim status is accorded to a facility which has notified EPA of its activities, which has submitted Part A of the application, and which was in existence on November 19, 1980 [5] or at the time of a statutory or regulatory change which subjected it to an RCRA permit requirement. 42 U.S.C. § 6925(e)(1); 40 C.F.R. §§ 265.1(b), 270.10(e). Facilities which qualify for interim status are required to adhere to EPA's standards for operation of interim status facilities. 40 C.F.R. §§ 264.3, 265.1(b), 270.1(b), 270.71.

### A

■ Holderness first argues that he could not have violated § 6928(d)(2)(A), which makes knowingly storing a hazardous waste without a permit unlawful, because Hi–Shear had interim status authorization and was therefore not "without a permit or interim status authorization" to store hazardous waste from its California facility as the indictment charges. He points to evidence that Hi–Shear submitted Part B of an RCRA application on October 5, 1987 and notified NDEP that propellant operations at Storey would commence in October 1987. NDEP responded by letter of October 22, 1987 that Hi–Shear's application was deficient, that "[i]n the interim" it would review a revised application and regulate the Storey operation "based upon the proposed standards of November 7, 1986," and that "until such time as a permit is issued for [a] thermal destruction operation, open-burning of waste explosives

---

5. As originally enacted, RCRA allowed facilities in existence on October 21, 1976 to qualify for interim status. Pub.L. No. 94–580, 90 Stat. 2795, 2809 (1976). That date was later extended to November 19, 1980. Pub.L. No. 96–482, 94 Stat. 2334, 2338 (1980).

is prohibited." From this exchange, Holderness infers that Hi–Shear was authorized to store hazardous waste until NDEP issued a permit for disposal. He notes that a facility with interim status is treated as having a permit until NDEP makes a final determination on the permit application. Thus, he contends, as a matter of law, he could not be charged with a violation of § 6928(d)(2)(A). We disagree.

While Holderness characterizes the interlude between Hi–Shear's application (and NDEP's rejection of it) and issuance of a temporary permit for Storey as "interim status authorization" to store hazardous waste generated in California, "interim status" is a creature of statute and applies only to facilities that were in operation by November 1980, 42 U.S.C. § 6925(e)(1)(A)(i), or on the date when new statutory or regulatory requirements necessitated a permit, 42 U.S.C. § 6925(e)(1)(A)(ii). Holderness admits that construction on Hi–Shear's Storey facility did not begin until 1987. He also does not identify any new statute or regulation which would justify interim status, nor could he, because applicable regulations required a permit for storage of off-site hazardous waste at all times relevant to this prosecution. Therefore, the Storey facility was not legally qualified for interim status authorization, and there is no basis for invalidating the indictment or overturning the conviction on this account.

■ Nor may "interim status authorization" be implied from NDEP's October 22, 1987 letter, as Holderness urges. The letter did not purport to grant Hi–Shear interim status, or authorization of any sort to engage in hazardous waste management; rather, the letter indicated that NDEP would review Hi–Shear's revised application in light of the proposed regulations, and then impose those regulations upon Hi–Shear's waste burning operation once a permit was granted. The language "[i]n the interim" in the letter referred to the period before approval of the proposed regulations and not to "interim status," which is a statutory term of art. It is thus immaterial whether a facility which has been granted interim status is treated as having been issued a permit, or what conditions would obtain for a facility which is operating pursuant to such an authorization.

■ Holderness also argues that the government was aware of the Storey facility's "purpose as a generator, transporter, treater/storer/disposer" of hazardous waste, and knew that the Storey facility was engaged in these functions at the time of the NDEP inspection on June 9, 1988. As a result of that visit, NDEP issued a Finding of Alleged Violation on June 20, 1988. Holderness contends that because the Finding did not cite any violation having to do with hazardous waste generated in California except the Storey facility's failure to have copies of the Uniform Hazardous Waste Manifest for shipments from California, storage of waste from Saugus must have been permitted. In any event, he urges, it is unfair for him to be prosecuted criminally for a practice about which the government was aware and did nothing.

We see nothing in NDEP's failure to note a storage violation that invalidates the charge of storing hazardous waste without a permit. It may be that while the inspectors suspected that some of the material stored at Storey had come from Saugus, without manifests and without access to the waste bunker they lacked sufficient knowledge to make a finding. In any event, to the extent NDEP's post-inspection position is relevant, its June 21, 1988 letter rescinding the temporary permit alleged that Hi–Shear had imported and burned waste propellant. We accordingly see no basis in the NDEP's conduct of its June 1988 investigation for inferring the existence of an interim status authorization for the storage of hazardous waste from Saugus.

■ Finally, Holderness seems to argue that the temporary permit to burn accumulated waste propellants and explosives which was issued February 16, 1988 is a permit to dispose of hazardous waste stored at the Storey facility, and so is evidence of a valid interim status authorization to store hazardous waste from Saugus. On its face, however, the temporary permit says that it is for open-burning of limited quantities of waste propellant and that "[a]ny treatment or management of hazardous waste not authorized

in this permit is prohibited." Storage and disposal are different types of waste management activity. 40 C.F.R. §§ 270.1(c), 270.2. A permit to dispose of waste (which may be accumulated on-site for 90 days without a permit, 40 C.F.R. § 262.34(a)) that specifically precludes other types of hazardous waste management, does not indicate as a matter of law that the facility had an authorization to store materials from off-site generators.[6] *See United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35 (1st Cir.1991) (defendants with permit to dispose of liquid toluene waste properly convicted of transporting and disposing of solid toluene-contaminated soil without a permit).

For these reasons we cannot say as a matter of law that Holderness was improperly charged with storing hazardous waste without a permit or interim authorization in violation of § 6928(d)(2)(A).[7]

### B

■ Holderness also contends that he was improperly charged under § 6928(d)(2)(B), which prohibits the disposal of hazardous waste "in knowing violation of any material condition or requirement of [a] permit," since Hi–Shear's temporary permit for the disposal of waste propellant at the Storey site did not contain an express or incorporated condition limiting disposal to waste propellant generated at the Storey site. He argues that the condition he is alleged to have violated could not be a material condition because all RCRA permits must incorporate certain conditions, 40 C.F.R. § 270.30, and any additional conditions "shall be incorporated either expressly or by reference," 40 C.F.R. § 270.32(e).

It is fundamental that an entity which performs a hazardous waste activity for which a permit is required under RCRA may not legally perform that activity unless it has a permit for the relevant activity. 42 U.S.C. § 6925(a); 40 C.F.R. § 270.1(c); *see also MacDonald & Watson*, 933 F.2d at 46, 49. Therefore, Holderness's argument that Hi–Shear's permit does not expressly or by reference incorporate a condition that prohibits the burning of waste from Saugus does not by itself provide grounds for overturning his conviction under § 6928(d)(2)(B). Such a condition could fairly be implied from a permit which expressly allowed only disposal of hazardous waste generated on-site at Storey, but did not forbid other waste disposal activities. *See MacDonald & Watson*, 933 F.2d at 49 (referring to "express or implicit condition" in RCRA permit). Nevertheless, Holderness's argument has force because this is not what his permit says.

The permit provides that it was "issued to Hi–Shear Technology Corp. (hereinafter called the Permittee) to open-burn waste propellant at its facility in Storey County, Nevada." This language plainly limits the site of waste-burning activities but does not specify the origin of burned waste. Hi–Shear is the permittee and burned only waste which it itself produced (both at Saugus and at Storey). The only condition in the permit relating to the nature of the waste which Hi–Shear was permitted to burn provides: "The Permittee shall not open-burn any material other than waste propellant. Prohibited materials include contaminated solvents, clothing, etc." Furthermore, the public notice regarding the permit used nonexclusive language regarding the source of waste: "Materials to be open-burned *include* waste propellants from the manufacturing operation in Storey County." (emphasis added).

There is no unambiguous interpretation of Hi–Shear's permit which limits its scope to the disposal of waste generated at Storey. Consequently, the permit contains no condition, express or implied, which forbade the

---

**6.** Holderness argues that requiring a permit for each type of hazardous waste activity would render § 6928(d)(2)(B), regarding material conditions of permits, meaningless. This is not so because of the numerous collateral obligations which may be imposed as conditions. *See* 40 C.F.R. §§ 270.30–.33; *United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 48–49 (1st Cir.1991).

**7.** While Holderness suggests that the government tried the case on the theory that storing hazardous waste was in violation of a material condition of the temporary permit, we do not decide whether there was any such violation since the indictment charges only that storage occurred without a permit or interim status authorization.

conduct charged in Count Three of the indictment. Therefore, Holderness's conviction under § 6928(d)(2)(B) cannot stand.

■ The government argues that the relevant EPA regulations limit the scope of the permit. Because Hi–Shear did not have a permit to store waste from off-site at Storey and because the exception for 90–day accumulation of waste applies only to waste generated on-site, 40 C.F.R. § 262.34(a), Hi–Shear had no legal right to store Saugus waste at Storey. Therefore, the government contends, the permit also does not allow disposal of Saugus waste at Storey. This argument fails because it depends on circumstances external to the permit. Under the government's theory, assuming (as we have decided) that the permit does not facially prohibit the conduct at issue, Hi–Shear could have gained the right to dispose of Saugus waste at Storey by obtaining a separate permit to store Saugus waste at Storey. We reject this theory and hold that to support liability under § 6928(d)(2)(B) a condition, express or implied, must be clear on the face of a permit.

The government also argues that the history of Holderness's efforts to get permission to burn waste propellant was premised on the mutual understanding of NDEP and Hi–Shear that only waste generated at the Storey facility was to be burned. It further argues that the existence of this material limitation on the scope of the permit was uncontradicted, based on Holderness's admission that he knew Hi–Shear had no permit to allow the disposal of Saugus waste in the burn pit at Storey. The government thus posits that the course of dealings between a permit applicant and regulatory authorities may serve to imply a condition into an RCRA permit.

Assuming that the evidence shows that Holderness knew he had no permit for disposal of waste not generated at Storey, and that the history of his dealings with NDEP reveal that Hi–Shear was looking for a permit to dispose only of waste generated at Storey, the troublesome question to which we return is whether Holderness can face criminal liability for violating a material condition of the permit when the permit itself has no express limitation and is not free from ambiguity regarding the permissibility of the challenged activity. The parties offer little guidance on the issue. We conclude that the course of dealings between parties is an improper basis, standing alone, for establishing a criminal violation of an ambiguous permit. In the end, the absence in this case of a clear condition in Hi–Shear's permit which unambiguously limits disposal to waste generated at Storey is fatal to Holderness's conviction under 6928(d)(2)(B).

### III

■ Holderness and Heuer argue that the evidence was insufficient to support their convictions on each count. Evidence is sufficient to support a conviction if "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The government is entitled to all reasonable inferences that might be drawn from the evidence. United States v. Johnson, 804 F.2d 1078, 1083 (9th Cir. 1986).

### A

■ Holderness argues that a rational jury could not have found beyond a reasonable doubt that he knew that the materials transported from Saugus were hazardous waste. In United States v. Hoflin, 880 F.2d 1033 (9th Cir.1989), cert. denied, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990), we held that "[t]he term 'knowingly' [in § 6928(d)(2) ] modifies 'hazardous waste.'" 880 F.2d at 1039. Though the issue in Hoflin was whether the defendant had knowledge of the hazardous nature of the waste, the term "knowingly" modifies both words in the unpunctuated phrase "hazardous waste." Furthermore, in the absence of specific guidance from RCRA's legislative history, the mens rea requirement of knowledge extends to each element of the offense. United States v. Speach, 968 F.2d 795, 796

(9th Cir.1992). Therefore, Holderness correctly asserts that knowledge that the material is waste is also a requirement for conviction under § 6928(d)(2)(A).[8]

Holderness contends that because the hazardous propellant transported from Saugus was a sample not intended for disposal, he was unaware that the material was waste. However, there is sufficient evidence that the propellant was intended for disposal, and of Holderness's awareness of this fact. The Saugus material was stored in a waste bunker at Storey and was not labelled as a "sample" until after NDEP rescinded Hi–Shear's temporary permit and raised questions about the materials transported from Saugus. Holderness also told a maintenance supervisor that propellant which Holderness had selected for disposal at Storey had come from Saugus. In addition, Holderness described the item "M119 WASTE" from a handwritten inventory as "M 119 GROSS SAMPLE" on a packing list submitted to NDEP. There was evidence that the weight of the "M119 GROSS SAMPLE" was 719 pounds; and Hi–Shear had earlier cancelled a contract to dispose of 700 pounds of waste. Finally, Hi–Shear's chief scientist, Dr. Donald Olander, testified that at least some of the material from Saugus was "junk" or scrap.

Holderness's argument that the Saugus material was a sample preserved until the conclusion of a contractual dispute with the government over the composition of the manufactured M119 propellant fails because only material "being stored temporarily in the laboratory after testing" qualifies as a sample under RCRA regulations. 40 C.F.R. § 261.4(d)(vi). Although this includes material stored until the conclusion of litigation, a rational juror could infer that 700 pounds of propellant stored in a waste bunker was not a sample temporarily stored in the laboratory after determination of its characteristics or composition.

### B

Holderness and Heuer were charged with knowingly falsifying the bill of lading and shipping papers dated April 27, 1988. Both contend that there was insufficient evidence that they knowingly made or caused to be made a false statement within the jurisdiction of the EPA, in violation of 18 U.S.C. § 1001.[9] To willfully make a false statement under § 1001, the defendant must have the specific intent to make a false statement. *United States v. Carrier*, 654 F.2d 559, 561 (9th Cir.1981). Specific intent does not require evil intent, but only that the defendant act "deliberately and with knowledge." *Id.* (quoting *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir.1962)).

Holderness asserts that he was unaware that the M119 material was waste, and that therefore he did not knowingly make a false statement to NDEP when he submitted the bill of lading containing the entry for the "M 119 GROSS SAMPLE." However, as discussed above, Holderness's statements and actions provide ample evidence from which the jury could find beyond a reasonable doubt that Holderness knew the material from Saugus was waste when he described the "M119 WASTE" as "M 119 GROSS SAMPLE."

Likewise, the evidence suffices to show that Heuer was aware the April shipments contained hazardous waste. Heuer told two members of the shipping crew that the material to be transported from Saugus was waste to be destroyed at Hi–Shear's Storey facility. The bill of lading dated April 27, 1988 was presented to Heuer for his signature in July 1988 by the vice-president of human resources, William O'Dell, who had

---

8. Because we reverse Holderness's conviction under § 6928(d)(2)(B), we do not consider the *mens rea* requirements of that subsection.

9. Section 1001 provides:
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C. § 1001.

typed the document. When O'Dell presented the bill of the lading to Heuer for his signature, Heuer said that "he'd take care of it."

## C

■ Heuer contends that his acquittal on charges of knowingly transporting a shipment of hazardous waste without a manifest is inconsistent with his conviction under § 1001 for falsifying a document regarding the contents of the same shipment. However, consistency in jury verdicts is not required when considering the sufficiency of evidence. *Johnson*, 804 F.2d at 1083. "The fact that a jury verdict of guilty on one count of an indictment is logically incompatible with a verdict of not guilty on another count does not warrant reversal of the conviction." *Id.* Therefore, our review is limited to a determination of whether the evidence was sufficient to find Heuer guilty of falsifying the bill of lading. As we have held, it was.

## IV

■ Heuer suggests that the Government improperly changed the theory of the case by stating during closing argument that the false statements at issue included the erroneous date on the bill of lading, and not just misdescription of the waste. We disagree. This theory was properly charged in the indictment, which stated that "[o]n or about November, 1988 … HEUER … made and used a Bill of Lading and shipping papers dated April 27, 1988…." [10]

■ Heuer also argues that the only statement which he knew to be false on the bill of lading was the date, and that the date was not a material statement. This argument fails because the date on the bill of lading was material in that it was essential to the representation that the bill of lading was prepared at the time of the shipment in question.

## V

■ Heuer next argues that the district court abused its discretion by denying his motion to sever. Denial of a motion for severance is reviewed for abuse of discretion. *United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir.1991). "A district court should grant a severance … only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

Heuer moved for severance before trial. However, he fails to identify on appeal any specific trial right which was abrogated by the district court's pre-trial denial of severance. The mere fact that certain allegations related only to Holderness is insufficient to justify severance. *See United States v. Vacarro*, 816 F.2d 443, 449–50 (9th Cir.), *cert. denied*, 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987).

■ Heuer failed to renew his motion for severance after it became clear that a substantial portion of the evidence at trial was directed at Holderness. No limiting instruction was requested. "Motions to sever must be timely made and properly maintained, or the right to severance will be deemed waived." *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). "Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict." *Id.* at 966. Therefore, Heuer waived his right to appeal the denial of his pre-trial motion for severance on the basis of the evidence at trial.

## VI

■ Heuer finally contends that the district court erred by not instructing the jury that knowledge of jurisdiction of the EPA was required for conviction. A district court's formulation of jury instructions is reviewed for an abuse of discretion. *United States v. Johnson*, 956 F.2d 197, 199 (9th

---

**10.** Hi–Shear submitted portions of the falsified bill of lading and shipping papers to NDEP in July, November, and December 1988.

Cir.1992). "Whether a jury instruction misstates elements of a statutory crime is a question of law and is reviewed de novo." *Id.* at 199.

There was no error in the district court's instructions here. The jury was properly instructed that the government "does not have to prove that the defendants knew that the statement alleged as false in Count Four was within the jurisdiction of an agency of the United States." As the Supreme Court has held, "[b]oth the plain language and the legislative history establish that proof of actual knowledge of federal agency jurisdiction is not required under § 1001." *United States v. Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984).

Although *Yermian* left unanswered the question of what mental state, if any, the government must prove for the jurisdictional element in § 1001, we held in *United States v. Green,* 745 F.2d 1205 (9th Cir.), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985), that "no mental state is required with respect to federal involvement in order to establish a violation of section 1001." *Id.* at 1209; *see also United States v. Oren,* 893 F.2d 1057, 1065 (9th Cir.1990) (citing *Green* with approval).

■ We decline Heuer's invitation to overrule *Yermian,* because it is not open to us to do that. Nor do we believe that Heuer's case is distinguishable from Yermian's on the footing that the bill of lading was an internal document while the form containing the false statements in *Yermian* contained the name of the Department of Defense printed at the bottom of the document and a warning that a false representation would violate 18 U.S.C. § 1001. The false statement does not have to be made on a form directly submitted to a government office or agency. *Oren,* 893 F.2d at 1060; *Green,* 745 F.2d at 1207. Furthermore, since no mental state is required for the jurisdictional element, the absence of a printed form from which knowledge can be inferred is irrelevant.

## VII

We affirm Holderness's convictions under 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 1001 as well as Heuer's conviction under 18 U.S.C. § 1001. However, we reverse Holderness's conviction under 42 U.S.C. § 6928(d)(2)(B) and remand his case for resentencing in light of the reversal on that count.

AFFIRMED IN PART and REVERSED and REMANDED IN PART.

REINHARDT, Circuit Judge, concurring:

Although I agree that Holderness could not be convicted of disposal in violation of a material condition of a permit under 42 U.S.C. § 6928(d)(2)(B), I write separately to emphasize that we do not today decide that an "implied" condition can *ever* exist in a RCRA permit. The applicable regulations clearly state that "[a]ll permit conditions shall be incorporated either expressly or by reference. If incorporated by reference, a specific citation to the applicable regulations or requirements must be given in the permit." 40 C.F.R. § 270.32(e). This regulation makes no mention of "implied" conditions, and the clear import of its language is that there is no such thing as an "implied" condition to a RCRA permit.

I am concerned that the majority's somewhat offhand discussion of "implied" conditions threatens to add considerable and unnecessary confusion to this area of the law. The majority states that a permit which allowed only the burning of waste from a particular source would include an implied condition that the permit holder could not burn waste from any other source. *Ante,* at [730]. There are two better answers to the question of what violation would occur under such circumstances. First, one can easily conclude that the condition that the waste could come only from source A—and thus not from sources B or C—would appear expressly on the face of the permit. There is no reason to open up the uncharted territory of implied conditions to deal with such a case. That would be so, incidentally, whether or not the permit contained the word "only." The import of the condition would be the same with or without the inclusion of that word.

The second answer, which is equally plausible, is that such a case would not involve disposal *in violation* of a permit, but rather disposal *without* a permit. That was the approach the First Circuit took on very similar facts. *See United States v. MacDonald and Watson Waste Oil Co.*, 933 F.2d 35, 49 (1st Cir.1991). In *MacDonald & Watson,* the defendants were convicted of transportation of hazardous waste to a facility without a permit under 42 U.S.C. § 6928(d)(1) and disposal of hazardous waste without a permit under 42 U.S.C. § 6928(d)(2)(a). The facility in that case had a RCRA permit, albeit not one allowing it to dispose of the type of toxic waste in question. On appeal, the defendants argued that they should have been charged with disposal in violation of a condition of the permit, rather than disposal without a permit. The First Circuit held that the defendants were properly charged with disposal without a permit, because the "natural straightforward interpretation" of the statutory language is "without a permit for the hazardous waste in question." *Id.* at 46–47 n. 10.[1]

We need not in this case address the problems that might arise where someone with a permit to dispose of waste from one source in fact disposed of waste from another source. However, we could resolve such an issue without introducing the troublesome and difficult concept of implied conditions. Such a concept could lead to endless inquiries into "the course of dealings between parties," *ante* at [731] to determine just what understandings were meant to be conditions. The majority tells us that the course of dealings, "standing alone," does not suffice to create a condition, but it does not tell us what if any additional factors are relevant in determining whether an implied condition exists. I would hesitate to read the majority's offhand comments as venturing into this difficult area.

Although the majority does not hold that an implied condition can exist in a RCRA permit, its casual injection of the issue where it is unnecessary to resolve the case could have wide ranging effects in the general law of licenses and permits. We should not address such a difficult issue in such an indirect and cursory manner. In any event, the regulations clearly state that any condition to a RCRA permit must appear on the face of the permit or be expressly referred to in the permit. I would not read the casual remarks about "implied conditions" in the majority opinion as holding anything else.

---

**1.** Indeed, neither the majority nor the appellee cites any authority which contradicts the plain language of the regulations and holds that an implied condition to a RCRA permit can exist. The one case the majority cites for this proposition, *MacDonald & Watson, supra,* treats the issue in a manner that is, if anything, even more casual than the manner in which the majority treats it. The First Circuit's *entire discussion* of implied conditions consists of one sentence of dictum: "Perhaps NIC's permit contained such an express or implicit condition, but, if it did, appellants have not identified it." *Id.* at 49. Such an offhand remark is not a justification for creating a doctrine which directly contradicts the applicable regulations, but I fear that as offhand remarks add up courts and judges may be tempted to assume incorrectly that the doctrine has been established.