**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

KRIKOR BAGHDASSAR TATOYAN,
a/k/a KRIKOR TATOYAN,
          *Defendant-Appellant.*

No. 05-50783

D.C. No.
CR-03-00961-SVW-
01

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ZENDA BEDROS TATOYAN, a/k/a
ZENDA TATOYAN,
          *Defendant-Appellant.*

No. 05-50784

D.C. No.
CR-03-00961-SVW-
02

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
November 17, 2006—Pasadena, California

Filed January 30, 2007

Before: Cornelia G. Kennedy,* Cynthia Holcomb Hall, and
Michael Daly Hawkins, Circuit Judges.

*The Honorable Cornelia G. Kennedy, Senior United States Circuit
Judge for the Sixth Circuit, sitting by designation.

1121

Opinion by Judge Hawkins

## COUNSEL

David J. Bederman, Atlanta, Georgia, for the defendants-appellants.

Brian M. Hoffstadt (argued) and J. Mark Childs, Office of the United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## OPINION

HAWKINS, Circuit Judge:

We examine the long-standing requirements surrounding the personal export of cash from the United States, the more recently enacted bulk cash smuggling prohibitions, and the ever-elusive requirement of willfulness. Here, as in many other areas, honesty remains the best policy.

### FACTS AND PROCEDURAL HISTORY

As they were about to board a flight to Paris at Los Angeles International Airport, Krikor and Zenda Tatoyan ("the Tatoyans") were stopped by United States Customs Inspector

Chung J. Lou ("Inspector Lou"), who was conducting currency enforcement examinations of passengers on that flight. At the time, Krikor had $8,000 cash in his pants pocket and $17,601 cash in two pouches hanging around his neck underneath his sweater, while Zenda had $10,000 cash in a plastic bag in her purse and $43,717 cash in various pouches in her purse. Although Inspector Lou did not follow, to the letter, the Customs Service's procedures for conducting currency examinations when he examined the Tatoyans,[1] he did inform them that there was no law against taking money out of the United States but that, if they were carrying more than $10,000, they must declare it and file a form with the Customs Service. He also informed them that there would be no taxes or penalties on any money they declared.[2]

When Inspector Lou asked the Tatoyans how much money they were carrying, Krikor responded that he was carrying $8,000 and Zenda said she was carrying exactly $10,000. Although, technically, a person need not fill out Customs Form 4790 unless carrying *more than* $10,000, Inspector Lou nonetheless asked Zenda to move to a nearby table and complete this form. On the form—which Zenda signed and Inspector Lou explained in detail—Zenda declared that she was carrying only $10,000.

Asked to produce the money, Zenda pulled a plastic bag from her purse that contained a bundle of exactly $10,000 cash. A subsequent search of the Tatoyans revealed the addi-

---

[1]According to testimony presented at trial, a Customs Service handbook instructs currency examiners to provide travelers with form CP 503 — which explains the currency reporting requirements—and have them read and sign this form to confirm that they understand these requirements. Inspector Lou failed to follow these procedures.

[2]According to the evidence presented at trial, the currency reporting requirements were also posted on placards located at the Tatoyans' ticket booth and at their departure gate, as well as in the Tatoyans' passports. Both Krikor and Zenda had traveled internationally prior to their anticipated November 8, 2003 flight.

tional $43,717 Zenda was carrying, as well as the $8,000 in Krikor's pants pocket and the $17,601 in his under-sweater pouches. When asked why they had responded the way they did when asked about the money, Krikor explained that the inspector had been talking quickly and that he did not want other passengers to hear how much money he and his wife were carrying. Zenda added that "people just told her to write $10,000." Interviewed separately, both Tatoyans said the funds were destined for Krikor's uncle in Iraq who needed financial help. The government presented no evidence at trial to contradict this or to establish that the funds were related to any illicit activity.

As a result of these events, the Tatoyans were each charged with conspiracy, failure to report an attempted transportation of over $10,000 out of the United States, bulk cash smuggling, and making a false statement to a government official.[3] On October 9, 2003, the Tatoyans agreed to a forfeiture settlement with the government under which $39,659—one half of the total funds—were administratively forfeited. The Tatoyans were later convicted by a jury of all counts and were each sentenced to pay a $100,000 fine, serve three years probation, perform 360 hours of community service, and pay a $400 special assessment.

Before trial, the district court granted the government's motion to exclude evidence regarding the apparently innocent purpose of the smuggled funds. The court also declined to adopt the Tatoyans' proposed jury instructions with regard to bulk cash smuggling under 31 U.S.C. § 5332 and making false statements under 18 U.S.C. § 1001. After sentencing, the court denied the Tatoyans' Motion for Judgment of Acquittal or for a New Trial. The Tatoyans now appeal their convictions, sentences, and the denial of their post-trial motion.

---

[3]These charges were brought under 18 U.S.C. § 371, 31 U.S.C. §§ 5316(a)(1)(A), 5322(a), 31 U.S.C. § 5332, and 18 U.S.C. § 1001, respectively.

**DISCUSSION**

## I. Sufficiency of the Evidence

The Tatoyans first argue that the evidence presented at trial was insufficient to support their currency reporting and bulk cash smuggling convictions under 31 U.S.C. §§ 5322(a) (requiring a "willful" violation of the currency reporting requirement) and 5332(a)(1) (requiring an "intent to evade" the currency reporting requirement) because Inspector Lou failed to follow the Customs Service's internal procedures for apprising travelers of the currency reporting laws.

A district court's determination that sufficient evidence supports a conviction is reviewed de novo. *United States v. Weber*, 320 F.3d 1047, 1050 (9th Cir. 2003). "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

[1] Under the currency reporting statutes, a defendant acts "willfully" if he has "knowledge of the reporting requirement" and a "purpose to disobey the law." *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994). Although Inspector Lou did not follow the protocol of presenting the Tatoyans with form CP 503—which might have more clearly established that they had "knowledge of the reporting requirement," *id.*—a rational fact-finder still could have concluded that the Tatoyans had actual knowledge of the requirement because Inspector Lou repeatedly explained it to them orally and because Customs Form 4790 (which the Tatoyans *were* given), as well as placards posted around the airport and warnings in the Tatoyans' passports, detailed the requirement in writing. *See United States v. Gomez-Osorio*, 957 F.2d 636, 640-41 (9th Cir. 1992); *United States v. Alzate-Restreppo*, 890 F.2d 1061, 1064 (9th Cir. 1989); *United States v. Rodriguez*, 592 F.2d 553, 557 (9th Cir. 1979). A rational fact-finder also could

have concluded that the Tatoyans had a "purpose to disobey the law," *Ratzlaf*, 510 U.S. at 141, based on their misrepresentations both to Inspector Lou and on Form 4790, as well as their careful concealment of the exact amount of money they failed to report.

[2] These conclusions are unaffected by the argument that the currency examination procedures Inspector Lou failed to follow were "mandatory" according to the Customs Service's internal policies.[4] Compliance with these internal agency regulations is not "mandated by the Constitution or federal law," *see United States v. Caceres*, 440 U.S. 741, 749 (1979),[5] and, therefore, it is not the province of this court to penalize the government for non-compliance. *Cf. id.* at 749-50 (tape recording admissible even though procured in violation of "mandatory" IRS procedures); *United States v. Hinton*, 222 F.3d 664, 674-75 (9th Cir. 2000) (package contents admissible even though postal service procedures not followed); *United States v. Ani*, 138 F.3d 390, 392 (9th Cir. 1998) (package contents admissible even though customs regulation violated). Indeed, to hold otherwise would be to discourage the Customs Service from promulgating internal guidelines that, in general, provide travelers with important information to help them avoid inadvertent customs violations. *Cf. Caceres*, 440 U.S. at 755-56 ("[A] rigid application of an exclusionary

---

[4]*See supra* note 1.

[5]The Tatoyans disagree and argue that, because Congress authorized the Treasury Secretary to "prescribe regulations . . . requiring reports on foreign currency transactions," 31 U.S.C. § 5315(c), any and all regulations *related to* these reports are also "mandated by . . . federal law" for *Caceres* purposes. This is incorrect. All § 5315(c) requires is that the Secretary "require[ ] reports on foreign currency transactions" and that these reports "contain information . . . necessary to carry out [the statute]." Form 4790 fulfills this function. The statute says nothing about the currency examination procedures inspectors must follow, nor does it suggest that other forms, like CP 503, must be given to travelers. *Cf. United States v. Soto-Soto*, 598 F.2d 545, 550 (9th Cir. 1979) (19 U.S.C. § 482 was *directly* violated by an unlawful search).

rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures.").

**[3]** Therefore, Inspector Lou's failure to follow the Customs Service's internal procedures neither violated due process under *Caceres*, 440 U.S. at 749, nor warranted an automatic finding of insufficient knowledge under *Ratzlaf*, 510 U.S. at 141. His actions merely made it more difficult—though, as evidenced by this case, not impossible—for the government to prove "actual knowledge."

## II.   Exclusion of Evidence

The Tatoyans next argue that the district court abused its discretion when, on the grounds of irrelevancy, it refused to allow the Tatoyans to present evidence of the apparently legitimate source and benevolent purpose of the confiscated funds. The Tatoyans contend that evidence showing that they were transporting money for an innocent reason—and not as part of their involvement in an illicit activity such as terrorism, money laundering, or drug dealing—would tend to show that they lacked the criminal culpability necessary for conviction of the specific intent crimes of failure to report and bulk cash smuggling. "We review a district court's ruling on the relevance of evidence for an abuse of discretion." *United States v. Rubio-Topete*, 999 F.2d 1334, 1338 (9th Cir. 1993).

**[4]** As explained above, a defendant need only have "knowledge of the reporting requirement" and "a purpose to disobey the law" to be found guilty of willfully violating § 5316, *Ratzlaf*, 510 U.S. at 141, and need only have the "intent" to violate § 5316 to be guilty of bulk cash smuggling. Such specific intent—by whatever name—"does not require evil intent, but only that the defendant act 'deliberately and with knowledge.'" *United States v. Heuer*, 4 F.3d 723, 732 (9th Cir. 1993) (quoting *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962)). The government, therefore, was only required to

prove that the Tatoyans knew they were required to file a report and that, for *whatever* reason, they deliberately evaded this requirement. Because motive is neither an element of the crimes nor a defense under either § 5322 or § 5332, the district court was within its discretion to exclude the disputed evidence.[6]

## III.   Bulk Cash Smuggling Instruction

The Tatoyans next argue that the district court's jury instructions for the relatively new offense of bulk cash smuggling, *see* 31 U.S.C. § 5332 (2001), were in error because the instructions: (1) failed to expressly require a willful violation of the law; (2) failed to require a temporal connection between the act of concealing the currency and the requisite intent to violate the statute; and (3) improperly merged the bulk cash smuggling and failure to report offenses.

The bulk cash smuggling statute, 31 U.S.C. § 5332(a)(1), reads as follows:

> Whoever, with the intent to evade a currency reporting requirement under section 5316, knowingly con-

---

[6]*United States v. Conners*, 825 F.2d 1384 (9th Cir. 1987)—a currency reporting case in which motive evidence *was* properly admitted—is distinguishable. *Conners* involved two unrelated defendants who each claimed that the other one hid several bundles of money in a car door to evade the reporting requirement. *Id.* at 1390. The court, therefore, allowed the government to present evidence of one defendant's cocaine activities because it was probative of that defendant's identity as the money-hider. *Id.* The motive evidence proffered by the Tatoyans was not probative of the guilty party's identity, nor was it probative of any other element of, or defense to, the currency reporting crimes. Therefore, *Conners* does not apply, and the court was free to exclude the proffered motive evidence.

Exclusion of this evidence also does not violate due process under *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), because "[a] defendant has no [constitutional] right . . . to present irrelevant evidence." *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992).

ceals more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, or from a place outside the United States to a place within the United States, shall be guilty of a currency smuggling offense and subject to punishment pursuant to subsection (b).

"We review the district court's formulation of jury instructions for an abuse of discretion," *United States v. Fernandez*, 388 F.3d 1199, 1246 (9th Cir. 2004); however, "[w]hether the district court's instructions adequately presented the defendant's theory of the case" is reviewed de novo, *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Fernandez*, 388 F.3d at 1246. Although no Ninth Circuit Model Jury Instruction exists for this relatively new statute, the instructions given by the district court, which carefully tracked the language of § 5332(a), were not "misleading or inadequate" for any of the reasons the Tatoyans suggest.

### A. Willfulness

**[5]** Because the bulk cash smuggling statute is codified under title 31, chapter 53, subchapter II of the United States Code, the Tatoyans argue that they can only be found guilty if they "willfully" violated the statute. *See* 31 U.S.C. § 5322 (prescribing criminal penalties for willfully violating any part of that subchapter). They contend that the jury instructions given—which recited § 5332(a) virtually verbatim, but did not import the "willfulness" requirement from § 5322(a)— failed to accurately capture this element of bulk cash smug-

gling.[7] We disagree, but hold that, in the absence of a jury determination that a *willful* violation of the bulk cash smuggling statute occurred, the criminal penalties authorized by § 5322—in particular, a fine of up to $250,000—are unavailable to the district court at sentencing for a violation of § 5332. *See infra* Part V.

Section 5332(a) states:

> Whoever, with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency . . . and transports or transfers or attempts to transport or transfer such currency . . . from a place within the United States to a place outside of the United States . . . shall be guilty of a currency smuggling offense and subject to punishment pursuant to subsection (b).

Subsection (b) then authorizes the court to impose a sentence of "not more than 5 years" for anyone "convicted of a currency smuggling offense under subsection (a)." § 5332(b). Because the court properly instructed the jury as to the elements of a currency smuggling offense under § 5332(a), and because this offense stands on its own and does not, itself, require "willfulness," there was no error in the district court's omission of a willfulness instruction on this count.[8]

---

[7]The jury instructions on this count were as follows:

First, the defendant knowingly concealed more than $10,000 in currency on his or her person in any conveyance, article of luggage, merchandise, or other container. Second, the defendant knowingly attempted to transport such currency from a place within the United States to a place outside the United States. Third, the defendant knew at the time of the alleged concealment he or she was required to file a report of the amount of money she was attempting to transport with the Secretary of Treasury. Fourth, the defendant intended to evade filing such a report.

[8]As discussed in Part V, however, this omission *does* have an effect on the penalty that may be imposed on the Tatoyans for violating the bulk cash smuggling statute.

*B. Temporal Nexus*

**[6]** The Tatoyans next argue that the language of § 5332 requires that the defendant have the intent to evade the reporting requirement at the time the actual concealment of currency occurs. A more natural reading of the statute, however, suggests that the intent to evade the reporting requirement can arise at any time prior to (and including) the moment of attempted transport—in other words that, as the district court found, "[c]oncealment is simply one part of a continuous course of conduct, at any stage of which the requisite intent can be formed." If Congress had intended the meaning the Tatoyans now urge, it would have made this intent clear—for example, by using the word "concealed" instead of "conceals" in the statute.

Indeed, if the interpretation urged by the Tatoyans were correct, travelers first learning of the reporting requirement at the airport—as most people do via the airport placards and customs inspector warnings—could not be guilty of violating § 5332 because they would not have known about the reporting requirement at the time of initial concealment. Even more troubling, sophisticated smugglers could entirely evade the consequences of § 5332 by having one person pack the bags containing excessive currency and having another person ultimately transport—and fail to report—this currency. The former would have concealed the money without having the requisite intent, while the latter would have had the requisite intent, but would not have participated in the actual concealment, rendering neither guilty—under the Tatoyans' theory—of bulk cash smuggling. Statutes should be read to avoid such absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).[9]

---

[9]Even if the intent to evade the reporting requirements were required to arise at the time the money was first physically concealed, a rational jury would still have found the Tatoyans guilty, rendering any jury instruction error harmless. *See Neder v. United States*, 527 U.S. 1, 18 (1999). The Tatoyans had carefully hidden the *exact* amount of money they failed to report, while they had put the money they admitted to possessing in more ordinary locations.

*C.  Merger*

The final contention with respect to the bulk cash smuggling jury instruction is that it improperly merged the bulk cash smuggling and failure to report offenses such that the jury may have believed that a guilty verdict for failure to report necessarily required a guilty verdict for bulk cash smuggling.

**[7]** The statute itself—as well as the record—seem to belie this fear. The district court correctly instructed the jury that bulk cash smuggling requires that the defendant "*knowingly concealed* more than $10,000 in currency on his or her person." § 5332(a) (emphasis added). Knowing concealment is *not* an element of the failure to report offense charged under §§ 5316(a)(1)(A) and 5322, however. Therefore, as a strictly textual matter, the two offenses, as they were described by the district court's jury instructions, do not merge. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

**[8]** The Tatoyans contend, however, that the additional "concealment" element does not cure the merger problem because every person at the airport the day the Tatoyans were confronted was concealing their currency—whether in a pocket, pouch, purse, bag, or wallet—and, therefore, anyone who failed to report their money in violation of § 5316 was also "smuggling" cash under § 5332. This may be true as a factual matter. However, as a logical matter, it is possible to be guilty of failure to report but innocent of bulk cash smuggling, and vice versa.[10] Therefore, under *Blockburger*, the two

---

[10]For example, a person who knowingly conceals $20,000 in his briefcase with the intent to evade the currency reporting requirements, but then "breaks down" at the airport and reports the full $20,000 on Form 4790,

offenses are distinct and the district court's instructions adequately captured this distinction. 284 U.S. at 304.

**[9]** Finally, to the extent that the two offenses appear to merge because virtually everyone guilty of one offense would also be guilty of the other offense, the Supreme Court has emphasized that:

> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983). Here, Congress's intent was clear: Section 5332 was expressly enacted because the previous "penalties for violations of the currency reporting requirements [were] insufficient to provide a deterrent to the laundering of criminal proceeds[; i]n particular, in cases where the only criminal violation under [previous] law [was] a reporting offense . . . ." Pub. L. No. 107-56, Title III, § 371(a)(6). Congress thus contemplated—and indeed welcomed—a scenario in which someone guilty of a reporting offense under § 5316 would also be guilty of a bulk cash smuggling offense under § 5332. Because the two offenses are distinct, there was no error in the district court's jury instructions on the bulk cash smuggling counts.

## IV.   False Statement Instruction

The Tatoyans next argue that the district court erred by failing to instruct the jury that acting "willfully" means acting

---

is technically guilty of bulk cash smuggling but not guilty of a failure to report. Similarly, a person who carries a wad of $20,000 cash in his bare hands (i.e., without "concealing" it), but refuses to report it on Form 4790, is technically guilty of a failure to report but not guilty of bulk cash smuggling.

"deliberately and not out of confusion, mistake or surprise." Again, on review, "the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Fernandez*, 388 F.3d at 1246.

**[10]** The Tatoyans' contention is incorrect for two reasons. First, the district court *did* instruct the jury that "[a]n act is done knowingly if the defendant is aware of an act and does not act or fail to act through *ignorance, mistake or accident*." Using the words "ignorance, mistake or accident" to modify "knowingly," rather than the words "confusion, mistake or surprise" to modify the word "willfully," does not render the chosen instruction inadequate. *See United States v. Garcia*, 37 F.3d 1359, 1364 (9th Cir. 1994) ("[S]o long as the [jury] instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion." (internal quotation marks omitted)).

**[11]** Second, the district court's instruction—which mirrored Ninth Circuit Model Jury Instruction 8.66—defined "willfully" in a manner that fully comports with Supreme Court and Ninth Circuit holdings. *See Browder v. United States*, 312 U.S. 335, 341 (1941) (willfully means no more than "deliberately and with knowledge"); *Notash v. Gonzales*, 427 F.3d 693, 698 (9th Cir. 2005) (same); *Heuer*, 4 F.3d at 732 (same). Nothing further was required here, as the Tatoyans' theory that they acted out of "confusion, mistake or surprise" was encompassed by the antonymous term "deliberately" in the jury instructions. *See United States v. Ripinsky*, 109 F.3d 1436, 1440 (9th Cir. 1997) ("[A] defendant is not entitled to any particular form of instruction and it is not error . . . to reject a theory-of-the-case instruction if the other instructions in their entirety cover the defense theory." (internal quotation marks and citations omitted)).[11]

---

[11]The Tatoyans also contend that the district court erred when it failed to instruct the jury that, to be found guilty, the defendants must have acted

## V.  Sentencing

The Tatoyans' final argument is that the $100,000 fines they each received are excessive under the Eighth Amendment. *See* U.S. Const. amend. VIII; *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). We do not reach this question, however, because we remand for resentencing due to the particular sentencing requirements of the bulk cash smuggling statute.

**[12]** As discussed in Part III, *supra*, because the district court properly instructed the jury on the elements of bulk cash smuggling, the jury's verdict stands. However, these instructions did not ask the jury to determine whether the Tatoyans *willfully* violated § 5332. Though not itself error, *see supra* Part III.A, it *does* limit the available penalties for bulk cash smuggling to those provided in § 5332.

**[13]** The bulk cash smuggling statute authorizes *only* a term of imprisonment as punishment, *see* § 5332(b),**[12]** whereas the

---

with the knowledge that they were making false statements to a government officer acting within the scope of his duties. The Tatoyans' opening brief, however, provided no explanation regarding why this instruction was necessary; thus, the argument is waived. *See United States v. Loya*, 807 F.2d 1483, 1486-87 (9th Cir. 1987) ("Issues raised in a brief which are not supported by argument are deemed abandoned.")

Even if Appellants' contention had been properly raised, it would not have succeeded. "No culpable mental state must be proved with respect to federal agency jurisdiction in order to establish a violation of section 1001." *United States v. Green*, 745 F.2d 1205, 1210 (9th Cir. 1984); *accord Heuer*, 4 F.3d at 733-34. Requiring the government to prove that the Tatoyans knew they were speaking to a government agent acting within the scope of his duties is simply another way of requiring the government to prove mens rea with respect to federal jurisdiction and is, therefore, precluded by *Heuer*, 4 F.3d at 733-34, and *Green*, 745 F.2d at 1210.

**[12]**Section 5332(b)(2) also provides for forfeiture of "any property, real or personal, involved in the offense, and any property traceable to such property."

more general criminal penalties statute for the Records and Reports on Monetary Instruments Transactions subchapter, § 5322(a), authorizes a term of imprisonment *or a fine of up to $250,000, or both*, for a willful violation of the subchapter, which includes § 5332. If the jury, after an appropriate jury instruction, had found that the Tatoyans *willfully* violated the bulk cash smuggling statute—i.e., that the Tatoyans "acted with knowledge that [knowingly concealing and attempting to transport more than $10,000 with the intent to evade a currency reporting requirement] was unlawful," 31 U.S.C. § 5332(a); *Ratzlaf*, 510 U.S. at 137—then the court would have been authorized to fine the Tatoyans up to $250,000 each for "willfully violating this subchapter," § 5322(a). In the absence of such a jury finding, however, the court is limited to the penalties listed in § 5332(b), which do not include a punitive fine.

[14] At sentencing, the district court did not sentence either Krikor or Zenda to serve prison time, but instead sentenced each to pay a $100,000 fine and complete 360 hours of community service. Because we cannot, on this record, determine the extent to which any portions of the $100,000 fines were imposed as punishment for the Tatoyans' violations of the bulk cash smuggling statute, we vacate the Tatoyans' sentences and remand to the district court for resentencing.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**